# Illinois Official Reports

## Appellate Court

---

### *People v. Fountain*, 2016 IL App (1st) 131474

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY FOUNTAIN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-13-1474 |
| Filed<br>Rehearing denied | August 23, 2016<br>September 14, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-10190; the Hon. Charles P. Burns, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and S. Amanda Ingram, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and John E. Nowak, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE SIMON delivered the judgment of the court, with opinion.<br>Justice Pierce concurred in the judgment and opinion.<br>Justice Hyman dissented, with opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant Timothy Fountain was found guilty of two counts of murder and one count of armed robbery. The trial court sentenced defendant to a mandatory term of natural life in prison for the two counts for murder concurrent with a 30-year sentence for armed robbery. On appeal, defendant claims that (1) the trial court committed reversible error in refusing to grant defendant a meaningful continuance following the State's disclosure of a new DNA report days before the trial, (2) he received ineffective assistance of counsel, (3) the trial court erred in failing to conduct a *Frye* hearing on the admissibility of historical cell site analysis, (4) he was denied his right to a fair trial when a State witness made improper and prejudicial comments, and (5) the State made improper comments during rebuttal. For the following reasons, we affirm.

¶ 2                                        BACKGROUND

¶ 3    Defendant was charged with multiple counts of murder, armed robbery, and burglary following the shooting deaths of Graciela Rodriguez and Nicholas Guerrero, and armed robbery of Maggy's Food Store on August 4, 2005, in Chicago. Before defendant's trial, the State moved to present evidence that a cell phone subscribed to by defendant was in the area of the store around the time of the crimes. The State enlisted FBI Agent Joseph Raschke to testify about historical cell site analysis. Defendant argued that the State failed to establish a proper foundation for this evidence where Raschke could not demonstrate the methodologies he used in concluding that defendant's phone was in the area of the store. Defendant also asked for a *Frye* hearing arguing that historical site analysis was new and novel and that it was not generally accepted within the scientific community. The trial court denied defendant's motions.

¶ 4    At trial, Brandon Grzesiak testified that on August 4 2005, he and his friend nicknamed "Millhouse," went to Maggy's Food Store around noon. They knew the woman who worked behind the counter and called her "Maggy." As they walked to Maggy's, Grzesiak saw a person standing at the bus stop outside the store. The bus stop was just four to five feet away from the front door at Maggy's. Grzesiak testified that the man at the bus stop was wearing a dark green shirt, blue jean shorts, and a black White Sox hat. Grzesiak did not know the man and only took a "quick glimpse" of the man on his way into Maggy's. He testified that he and his friend proceeded inside the store and bought two Swisher Sweets to empty out and fill with marijuana so that they could get high that afternoon. Upon leaving the store, Grzesiak again looked at the man at the bus stop. Grzesiak and that man made eye contact for a few seconds before the man looked away. Grzesiak identified defendant in court as the man he saw at the bus stop in front of Maggy's Food Store.

¶ 5    Luis Campagna, a Frito-Lay delivery man, testified that on August 4, 2005, he walked into Maggy's Food Store to the last of three aisles and saw a man lying on the floor in a pool of blood. He went back outside the store and called the police. He did not see anyone coming out of the store while he was loading his hand cart and did not notice any cars driving away. Police officers arrived within minutes and cleared and secured the area.

¶ 6    Chicago police officer Christopher Chausse responded to a call on August 4, 2005, of a person being shot at Maggy's Food Store at 4458 South California Avenue in Chicago. When Chausse arrived there at 12:21 p.m., he encountered Louis Campagna. Officer Chausse saw

victim Guerrero lying face down in a puddle of blood, and in the back room he saw the victim Rodriguez, lying face down.

¶ 7 Detective Velma Guerrero and her partner Detective William Gehrke arrived at Maggy's after the victims were transported to Mt. Sinai Hospital and before the forensic investigator arrived. Police investigator Raymond Jaster and his partner arrived at Maggy's on August 4, 2005, at about 1:40 p.m. Detective Guerrero directed Jaster to the back room of the store. In the back room, where one of the victims was found, Jaster found blood on the floor, a video recorder on a chair, and an expanded 0.5 caliber cartridge on the floor underneath a chair. The VCR recording system used at the store recorded the video from several cameras onto a VHS tape. There were two lottery tickets inside the lottery register, one with the number 5051, and the other with the number 5157. Police collected a cash tray from the register, the tray from the lottery machine, and a cigar box.

¶ 8 Detective Guerrero testified that, after removing the VCR, which still had the tape inside, she took it to a multi-agency technical office to have the tape removed. The tape was removed, copied onto a disk, and numerous still images were taken from the video. Detective Guerrero stated that she viewed that videotape probably hundreds of times. The videotape was admitted into evidence and Detective Guerrero testified as to its contents. Detective Guerrero recognized Millhouse approaching the counter in the video and Grzesiak by a cooler. Detective Guerrero also observed a young girl approach the counter and then reappear later in the scene. A few seconds after the young girl and Grzesiak left the store, the suspect walked in wearing a dark green shirt, a black White Sox baseball cap, denim shorts, and a belt. The suspect was holding a silver phone. The video shows the victim Rodriguez talking to the suspect. Then, the suspect checked the doorknob of the entrance to the rear area. The suspect asked for two lottery tickets: 5157 and 5051. The suspect then pointed a gun at Rodriguez through the cash window and ordered her to open the door to the register. The suspect removed money from the cash register and looked under the counter. The suspect then led Rodriguez out of the cash register area while asking her for the videotape. The video then showed the suspect escorting Rodriguez toward the rear office. The video ends at that point.

¶ 9 Officer Juan Chavez testified that he viewed the video surveillance tape and recognized one of the customers who entered the store before the suspect came in. That person was Brandon Grzesiak, a young man whose brother had been on Chavez's youth basketball team. Chavez told Detective McCormack that he recognized Grzesiak and went to find him. On August 8, 2005, Officer Chavez saw Grzesiak near a McDonald's located in the 3800 block of South Archer Avenue. Chavez talked to Grzesiak and together they drove to a gas station at 35th Street and South California Avenue near Maggy's where they met with Detective McCormack.

¶ 10 On August 18, 2005, Detective McCormack spoke with Lieutenant John Farrell about the lottery tickets recovered from the scene. One of those tickets was for number 5157, and McCormack ran that number in the Chicago police database as a south side address. McCormack checked the photographs of those who had a "5157" address in Chicago against individuals who looked like the composite put together by Grzesiak as well as the likeness of the offender as seen on the store video. After that search process, Detective McCormack came up with defendant's name. Officer Emmett McClendon testified that he met defendant on September 22, 1998, and at that time, he gave his address as 5157 South Union Avenue.

Sharon Moransky, a county employee, testified that she met defendant on March 29, 1999, and that defendant gave his address as 5157 South Union Avenue.

¶ 11 Following Grzesiak's encounter with Chavez, Grzesiak went to the police station and participated in composing a computer-generated sketch of the man he saw at the bus stop. After giving a description of the man he saw, Grzesiak viewed the surveillance video and recognized himself and Millhouse on the tape. On August 19, 2005, Grzesiak identified defendant's photo from a photo array. On April 12, 2007, Grzesiak viewed a lineup and identified defendant as the person he saw outside Maggy's and on the surveillance video pointing a gun at the victim Rodriguez.

¶ 12 Dr. Valerie Arangelovich, a forensic pathologist, performed the autopsies on victims Rodriguez and Guerrero and stated that they both died from single gunshot wounds to the head. Both bullets were fired from the same firearm. The pathologist took fingernail clippings from both the victims' hands and sealed them in an envelope before giving them to the police. The pathologist testified that victim Guerrero exhibited multiple pinpoint abrasions and contusions near his left eye, consistent with being hit with a hard metal handgun. Victim Guerrero, in addition to having a gunshot wound on the left side of his head, had a gunshot wound on the mid-portion of his right index finger.

¶ 13 Amy Winters, a DNA analyst from Orchid Cellmark Laboratory, received the swabs of the fingernails of both the victims and performed DNA testing on them. Using the swabs from DNA clippings, she amplified the extracted DNA and produced an electropherogram graph. The graph displayed 13 specific locations (loci) in the DNA. The 13 loci are used in the national DNA database that is used to search profiles.

¶ 14 Sarah Walker analyzed the victims' blood standards. She learned that there was a mixed DNA profile obtained from Guerrero's left-hand fingernail clippings. The minor profile was a man, and 8 of the 13 loci were identified. At the time of her report, there was no suspect, and the partial mixed profile was not compared to any other profile.

¶ 15 Davere Jackson, a forensic scientist in the DNA section of the Illinois State Police (ISP), compared the minor DNA profile obtained from Guerrero's left-hand fingernail clippings to a standard one from defendant. In 2007, Jackson concluded that defendant could not be excluded from that minor DNA profile and could be included as a donor. In 2012, after reading a report from defense's expert, Lawrence Mueller, Jackson reviewed her file and observed that she did not put all of the complete types of alleles at one of the locations; specifically location "D8" in the deduced minor profile: 13/16 and 14/16. Jackson's new report was issued on October 17, 2012. Jackson testified that the data did not change, but she erred in failing to write down the additional alleles at that location in her initial report. Jackson maintained that her opinion in 2007 and 2012 was that defendant could not be excluded as a contributor to the partial profile, and she opined that 1 in 1.7 billion black men would have this profile.

¶ 16 Pauline Gordon, a forensic scientist with the ISP, received the DNA profiles that Orchid Cellmark obtained from the fingernails of Guerrero. Gordon reviewed Cellmark's profile and determined that there were some alleles at particular locations of the minor profile that had not been suggested by Cellmark, but should have been part of that profile. In 2012, Gordon reviewed the minor profile recovered from Guerrero's fingernail clippings and made a new comparison to the standard from defendant. Following Jackson's new report, on October 19, 2012, Gordon issued an amended report. Gordon determined that defendant could not be excluded from having contributed to the minor male DNA profile recovered from Guerrero,

meaning that defendant was included as a donor to that minor profile. She opined that 1 in 56 billion black men would have this profile.

¶ 17 Gordon explained that the discrepancy between her calculation of the frequency and Jackson's calculation from 2007 arose from the process now available that allows the application of statistics to those locations where there was partial information, allowing her to do more calculations at that location. She testified that neither her interpretation nor Jackson's would exclude defendant from the DNA profile. Gordon acknowledged that Cellmark found that the minor profile at locus TH01 showed a 7/9, and that defendant was a 7/7 at that locus. Gordon stated that 7/9 found by Cellmark was a "database profile" and that she created an "interpretation profile." She also testified that Cellmark and ISP have "different guidelines" that account for different interpretations at the TH01 locus. At D18S51, Gordon testified that there was allelic dropout. Allelic dropout means that the minor profile at that locus was not copied sufficiently and fell below the detection threshold. Contrary to Jackson's 2007 report that considered 16/16 an option at D8, Gordon did not consider 16/16 as an option at that location. Gordon acknowledged that it was true that there are other possible contributors to the minor profile other than defendant. She explained that they would need to have a known buccal standard from another individual to determine that.

¶ 18 Solandia Haddock testified that she was the subpoena specialist for U.S. Cellular. Defendant purchased a Kyocera KE 434 phone and became a U.S. Cellular customer on July 16, 2005, with a phone number 773-329-8846. The Kyocera is a regular nonflip phone, and, at that time, was available in either silver or blue. The call detail records for defendant's account on August 4, 2005, showed 19 incoming calls between 5 a.m. and 10:50 p.m.

¶ 19 FBI Agent Joseph Raschke testified as an expert in the field of historical cell site analysis. He stated that he worked on 150 to 200 cases where he was asked to determine the location of a cell phone. Raschke testified that when a call is placed, the phone sends a signal to a cell tower. When a call is received, the cell tower sends a signal with the information to the cell phone. A call detail record is generated that shows the time and the date the call occurred, which phones were involved, and which cell towers were used. A phone can search up to six towers, and the call detail records do not show which towers the phone could connect with at any given moment. There is a presumption that the phone will use the nearest tower. Raschke's coworker, Nicky Skovran, did the initial analysis in the case. Raschke took all of her materials, including her report, redid the analysis, and concurred with her findings.

¶ 20 Raschke used a PowerPoint presentation that he prepared to assist in his testimony. Defendant's call detail records showed that on August 4, 2005, from 10:01 a.m. up to and including 11:24 a.m., defendant's cell phone used the cell tower at 130th Street and Vermont Avenue, Tower 4, for 10 calls. The call records from 11:24 a.m. through 11:54 a.m. showed defendant's phone connecting to a succession of different towers heading near the Dan Ryan Expressway.

¶ 21 At 11:54 a.m., defendant's phone received an incoming call and was connected to Tower 102 at 47th Street and Ashland Avenue. At 11:56 a.m., his phone was connected to Tower 219 on Artesian Avenue, the tower just southwest of Tower 102. At 11:57 a.m., defendant's phone was connected back to Tower 102. Both towers were located near Maggy's. At 12:09 p.m., defendant's phone connected again to Tower 219. The next call to defendant's phone came at 12:12 p.m., which resulted in his phone connecting to Tower 81, which was north and a bit east of Tower 219 and just under a mile from Maggy's. At 12:13 p.m., a call to defendant's phone

connected his phone back to Tower 219. Raschke testified that defendant was most likely located in a place that would use both of those towers. A call at 12:16 p.m. caused defendant's phone to connect again to Tower 219. When defendant's phone received a call at 12:18 p.m., his phone connected to Tower 66, the tower just south and west of Maggy's. Next, between 12:09 p.m. and 12:18 p.m., defendant received five phone calls and defendant's phone was located near the location of Maggy's.

¶ 22    The next call to defendant's phone was at 1:10 p.m., and defendant's phone connected to Tower 4 around 127th Street and I-57. Between 1:10 p.m. and 1:24 p.m., defendant's phone received eight calls and all caused his phone to connect to Tower 4 near his girlfriend's house at 12752 South Morgan Street. Raschke opined that the lack of calls to defendant's phone between 12:18 p.m. and 1:10 p.m. could have been because no one attempted to call his phone or that the phone was turned off during that time.

¶ 23    The defense called Dr. Laurence Muller as an expert in the area of population genetics. Muller reviewed the reports from Cellmark, ISP, as well as the electropherograms in this case. Muller reviewed Jackson's report from 2007, which said that defendant could not be excluded as a contributor, and he believed that Jackson's conclusion was inconsistent with the statistical calculation that was done because it focused on a group of genetic profiles, none of which matched defendant. Looking at the statistical calculation in the 2007 report, specifically at D8 locus, the ISP concluded that the minor contributor had a profile of 16/16. Defendant had a 14/16 at D8; therefore Muller concluded that defendant could not have been a contributor. Muller wrote that conclusion in his December 2011 report.

¶ 24    Muller also noted the discrepancy at TH01. At that locus, Cellmark found that the minor profile was a 7/9, while defendant was a 7/7 at that location. Muller testified that the State's explanation for this discrepancy, that the interpretations were for different purposes, was not adequate. Regarding the allelic dropout at D18S51, Muller testified that defendant was a 18/19 at that locus, the only allele identified at that locus is a 15. If the 15 is the only genetic variant, then defendant would be excluded. If defendant was a contributor, then his contribution did not amplify sufficiently to be recorded. Mueller did not believe it was the conservative approach to assume allelic dropout at this location. If there was no allelic dropout, then this evidence is more consistent with an exclusion, rather than an inclusion. Muller acknowledged that there was a combination that included defendant, but also there was no way to determine which combination was correct. Muller testified that the first ISP report from 2007 produced a total of 21,504 different genetic profiles, Jackson's new report with the new data included had 64,512 possible profiles, and the final ISP report issued by Gordon produced 86,016 possible profiles.

¶ 25    Luis Lechuga also testified on defendant's behalf. Lechuga was 14 years old on August 4, 2005. He testified that, at around 2 p.m. or 3 p.m., he went to Maggy's, a place he usually visited several times a day. After he walked in, he noticed a black man come in wearing a baseball cap. Lechuga stated that defendant was not the man he saw that day. About 30 seconds later, an older man, whom Lechuga knew as "Nicholas," also came in the store and said something in Spanish.

¶ 26    Lechuga testified that he felt that something was wrong and went to the back of the store. He unlocked the back door, came out on 45th street and walked back to the front of the store. He testified that he walked back to the front of the store and saw a black man leaving the store with cigarette boxes and then getting into a car with two other black men. That man was

wearing a green shirt, blue jeans, and a White Sox hat. Lechuga testified that a Frito-Lay guy told him not to go inside and that he had just called the police.

¶ 27 On cross-examination, Lechuga acknowledged that the week he was testifying was the first time that he told any investigator that he was inside Maggy's when the two people were killed. Lechuga testified that, when the police interviewed him on August 14, 2005, he never told them he went inside Maggy's because his mother did not want him to get involved. Instead, he told the police that he was going to Tastee Freez and that he was across the street from Maggy's when he saw a man with a black White Sox hat coming out of that store. He also told the police that the man had a cell phone and got into a green car. Lechuga testified that he saw Guerrero's legs after the Frito-Lay man opened the door.

¶ 28 In rebuttal, the State called Detective Guerrero. Detective Guerrero testified that Guerrero's body was not found "anywhere near" where Lechuga said he had been. Guerrero was not found by the chip aisle, but by the cooler. The back door to the store out of which Lechuga claimed to have fled had two bolt locks, and the door was still locked when the detectives arrived. Next, investigator John Duffy from the Cook County State's Attorney's Office testified that he interviewed Lechuga on October 26, 2012. Lechuga told Duffy that he was not clear if he could not identify the man or if his mother had encouraged him not to identify anyone for his own safety.

¶ 29 The jury found defendant guilty of two counts of murder and one count of armed robbery. The court sentenced defendant to natural life for the two murder convictions, concurrent with a 30-year sentence for armed robbery. This appeal followed.

¶ 30                                            ANALYSIS
¶ 31                                          Continuance

¶ 32 Defendant argues that the trial court abused its discretion in a failing to grant defendant a meaningful continuance following the State's disclosure of new DNA reports from its experts days before the trial. Defendant claims that the State's new reports filed in October 2012, a few days before defendant's trial, were different from the first DNA report filed in 2007, which indicated that defendant was a partial match to the minor DNA profile recovered from the fingernail clippings of the victim Nicholas Guerrero. Defendant explained that the defense needed to evaluate the new reports, consult with their expert and fully investigate the new information when the previous report excluded defendant as a contributor. Defendant contends that the trial court's insistence on keeping a trial date in the light of the new reports denied his right to a fair trial.

¶ 33 It is well settled that the granting or denial of a continuance is a matter resting in the sound discretion of the trial court, and a reviewing court will not interfere with that decision absent a clear abuse of discretion. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). Whether there has been an abuse of discretion necessarily depends upon the facts and circumstances in each case and " '[t]here is no mechanical test *** for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend.' " *Id.* (quoting *People v. Lott*, 66 Ill. 2d 290, 297 (1977)). Factors a court may consider in determining whether to grant a continuance request by a defendant in a criminal case include the movant's diligence; the defendant's right to a speedy, fair, and impartial trial and the interests of justice; the history of the case; the complexity of the matter;

and the seriousness of the charges as well as docket management judicial economy and inconvenience to the parties and witnesses. *Id.* at 125-26.

¶ 34    Where it appears that the refusal of additional time in some manner embarrassed the accused in the preparation of his defense and thereby prejudiced his rights, a resulting conviction will be reversed. *People v. Lewis*, 165 Ill. 2d 305, 327 (1995). We cannot find an abuse of discretion without the defendant having shown that he was prejudiced by the court's denial. *People v. Coleman*, 203 Ill. App. 3d 83, 100 (1990).

¶ 35    Here, we cannot say that the trial court abused its discretion. The trial court carefully considered relevant factors such as the interests of justice, the fact that the case had been on the docket for 6 years. The trial court also properly assessed the complexity of the DNA evidence, judicial economy, and inconvenience to the parties and their witnesses in deciding to grant defendant the requested one day continuance to review the new DNA reports.

¶ 36    Contrary to counsel's argument at oral argument that the trial court "mechanically" refused to grant defendant a meaningful continuance, the record reflects that the court considered the issue over the course of three hearings. Specifically, on October 18, 2012, defense counsel acknowledged that she received Davere Jackson's revised DNA report from October 17, 2012. The trial court continued the case for the next day to "see what the [defense] expert opinion is and I'll make a determination whether or not the case needs to be continued." After hearing additional arguments on this issue at the hearing on October 19, 2012 when a new report was received from Gordon, the court again continued the case until October 22, 2012, stating that "when I get all the information, I will decide whether or not it is prudent to give you a continuance." On October 22, 2012, counsel argued that "knowing what the court's position is on the continuance because you told us last week, we are asking for *just a day*, one day so that we can do our due diligence with our attorneys getting ready, with documents that were just tendered as well as talking with our consultant and seeing if—what there is here that we can digest." Finally, on October 22, 2012, the day when the trial was scheduled to begin, the trial court granted defendant's request to continue the case to the next day for jury selection. The trial court determined that a one day continuance was warranted noting that defendant still had ample time to investigate the ramification of the State's new DNA reports until the DNA experts would testify at trial almost a week later. The trial court observed that in the new report Jackson admitted to making an error in failing to properly note all the relevant DNA data, although her initial conclusion that defendant could not have been excluded remained the same as in 2007. As such, after careful deliberation, the trial court exercised its discretion and granted defendant's request for one day continuance.

¶ 37    In addition, the new reports were not a surprise for the defense whose expert pointed out Jackson's mistake in his 2011 report. The 2007 report inferred a 16/16 profile and defendant had a 14/16, so based *on the noted data*, defendant could not have been a match. However, Jackson's conclusion that she could not exclude defendant as a contributor did not change from 2007 to 2012. The new report stated that 16/16 profile was still possible, but that 14/16 and 13/16 were also possible, making defendant a potential contributor. Again, defendant knew about the flaws in the State's DNA data interpretation since 2011 and the 2012 State's report, just as the 2007 report, concluded that defendant could not have been excluded as a contributor. At most, the new report exposed flaws in the State's initial interpretation of DNA data, flaws that defense was familiar with since 2011. The trial court properly concluded that

defendant would use all the information provided in Jackson's new DNA report as meaningful ways to cross-examine the State's DNA expert witness on her noted data and her conclusions.

¶ 38 Furthermore, defendant fails to offer any argument on how he was prejudiced by the court's decision to grant defendant a one day continuance as opposed to a more lengthy continuance. Seven days passed between receiving the State's revised analysis on October 18 and the State expert's testimony at trial on October 25. The record reflects that defense counsel extensively attacked the revised DNA reports. On cross-examining, using Jackson's charts, defense counsel had Jackson highlight for the jury that defendant was a 14/16 at D8 locus when in her 2007 report Jackson concluded that the partial minor profile at D8 was a 16/16.

¶ 39 Similarly, Dr. Lawrence Muller, the defense expert who testified on October 29, highlighted the differences between the 2007 analysis, his analysis, and the revised analysis from 2012, emphasizing Jackson's flaws in the interpretation of the DNA data in her 2007 report. He pointed out the D8 locus in which the 2007 report inferred a 16/16 profile and that defendant had a 14/16 so there could not have been a match. Based on the extensive cross-examination of the State's expert witness and the detailed testimony of the defense expert witness, we cannot say that the defense was not adequately prepared during the trial proceedings. See *People v. Balfour*, 2015 IL App (1st) 122325. To the contrary, defendant fails to show what else defense counsel could have done if given a more lengthy continuance or how was he prejudiced by the court's decision to grant the requested one day continuance.[1]

¶ 40 The dissent speculates that a meaningful continuance would have been, as counsel argued during oral argument on appeal, three weeks. However, such a request was not made in the trial court. Counsel requested a one day continuance and the trial court granted it. The defendant did not present in the trial court reasons or a basis for a continuance longer than *one day*, which he ultimately got. Defendant's counsel never moved for or asked the court for a longer continuance nor moved the court for more time to hire a new expert. The court cannot have abused its discretion when it granted all the relief defendant sought.

¶ 41 Furthermore, the dissent extensively points out the weakness in the State's different DNA reports and uses the defense's trial exhibit to expose their flaws. But all the weaknesses, flaws and different conclusions in the State's DNA reports were raised, argued, highlighted and emphasized to the jury by the defense. The jury had all the evidence and considered what weight to give it and whether it proved the charge beyond a reasonable doubt. We cannot, as the dissent apparently wants, substitute our judgment for theirs. Accordingly, the trial court's decision to grant the *requested one day* as opposed to an unrequested longer continuance was not "arbitrary, fanciful, or unreasonable or that no reasonable person would take the view adopted by the trial court." See *People v. Strobel*, 2014 IL App (1st) 130300, ¶ 7.

---

[1]Defendant's contention for the first time at oral argument that the defense counsel could have consulted and hired a statistics expert since Dr. Muller was an expert in population genetics is waived when defendant failed to raise it in his briefs. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 42                                    Ineffective Assistance of Counsel

¶ 43    Defendant argues in the alternative that his defense counsel was ineffective for failing to exclude DNA evidence entirely as irrelevant. Defendant contends that, pursuant to the State's revised DNA report, defendant was a match to the minor profile that was found in the left hand fingernail clippings of Nicholas Guerrero. Defendant maintains that defense counsel should have moved to exclude the DNA evidence entirely, where a less than 13 loci match had no probative value. Additionally, defendant argues that defense counsel was ineffective for failing to move for a DNA database search to determine how many individuals in the Illinois database matched at 8 loci.

¶ 44    Claims of ineffective assistance of counsel are reviewed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004). Under *Strickland*, a defendant must prove that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense in that absent counsel's deficient performance there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687, 694. Under the first *Strickland* prong, defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *People v. Enoch*, 122 Ill. 2d 176, 201 (1988); see also *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984) ("Effective assistance of counsel refers to competent, not perfect representation.").

¶ 45    Further, in order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *Id.*; *People v. Smith*, 195 Ill. 2d 179, 188 (2000). The only exception to this rule is when counsel's chosen trial strategy is so unsound that "counsel entirely fails to conduct any meaningful adversarial testing." (Internal quotation marks omitted.) *People v. Cooper*, 2013 IL App (1st) 113030, ¶ 63. In other words, the presumption that the challenged action or inaction was the product of sound trial strategy may be overcome where no reasonably effective defense attorney, confronted with the circumstances of the defendant's trial, would engage in similar conduct. *People v. Watson*, 2012 IL App (2d) 091328, ¶ 24.

¶ 46    Here, defense counsel's decision to challenge the State's DNA evidence in a different way than moving to exclude it was a matter of trial strategy unchallengeable under *Strickland*. The record indicates that defense counsel extensively attacked the credibility of the State's DNA experts regarding their new revised reports, which they created after defense expert Dr. Muller opined that, contrary to the conclusion in the 2007 State's initial report, the data excluded defendant as a minor contributor. Defense counsel also presented the testimony of defense expert Dr. Muller, who pointed out the flaws in the State's initial DNA report, and highlighted in two charts the differences between his analysis, the State's initial DNA report, and the State's revised reports from its experts, Jackson and Gordon.

¶ 47    Similarly, in closing argument, defense counsel zealously attacked the reliability of the State's DNA evidence emphasizing, for instance, that the new reports were written just days before the trial: "when? Last Friday." Counsel argued, among other things, that the jury should disregard the State's DNA reports not excluding defendant since "none of [State's reports] match." Counsel highlighted Dr. Muller's testimony, his detailed charts, and his opinion that up to 86,000 other people would not be excluded using the State's DNA reports. Counsel

ended the lengthy attack on the DNA evidence stating "why these last minute re-interpretations. Try to make the DNA case stick against my client. Where it doesn't stick." Therefore, the record clearly establishes defense counsel's efforts and strategy during the trial and at closing arguments to undermine the State's DNA evidence by attacking the credibility and the reliability of the State's experts and DNA reports. See *People v. Daniels*, 301 Ill. App. 3d 87, 100 (1998) (holding trial counsel was not ineffective for failing to more vigorously oppose DNA evidence: "It appears defense counsel's trial strategy was to use the State's DNA evidence as a weapon to attack the credibility of all forensic evidence."); see also *In re Brandon P.*, 2013 IL App (4th) 111022, ¶ 56 ("[W]e conclude that defense counsel's failure to object to the admission of [DNA] evidence did not amount to ineffective assistance of counsel.").

¶ 48    Defendant cites *People v. Wright*, 2012 IL App (1st) 073106, in support of his argument that the DNA evidence in this case should have been excluded entirely because an 8 loci match was insufficient to be treated as a match. In *Wright*, the DNA evidence constituted essentially the sole evidence used to identify the defendant from a felony database as the perpetrator of a sexual assault where the victim could not identify her attacker. *Id.* ¶ 81. *Wright* addressed the trial court's error in failing to order a pretrial DNA database search where the primary evidence to identify the defendant as the offender was a 9 loci analysis between his DNA and a male DNA profile obtained from the victim's rectal swabs. *Id.* The database search request was made pursuant to section 116-5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-5(a) (West 2012)), which requires a defendant to show only that "DNA evidence may be material to the defense investigation or relevant at trial." *Wright*, 2012 IL App (1st) 073106, ¶ 81. In *Wright*, the majority acknowledged the fact that it was *not* asked to determine whether the expert's conclusion of a "match" based on only 9 loci was correct but, instead, it had been asked to determine whether the trial court abused its discretion in denying the defense the ability to investigate and impeach that conclusion. *Id.* ¶ 86. In addition, the court addressed the defendant's claim that his trial counsel was ineffective in his handling of the pretrial DNA motion and for failing to hire an independent DNA expert. *Id.* ¶ 103. Specifically, the *Wright* majority concluded that counsel rendered ineffective assistance by asking the trial court to order a database search that had already been done and, moreover, had been done at the request of the same counsel.

¶ 49    The facts and analysis in *Wright* are not pertinent to the instant case, which did not rely solely on the DNA evidence to identify an otherwise unknown offender. Here, the DNA evidence was a part of the State's case, and the State did not argue that the DNA evidence in and of itself established that defendant's DNA was a true match, but argued that defendant could not be excluded as a contributor to the DNA profile recovered from one the victims. Moreover, unlike *Wright*, here, trial counsel extensively cross-examined the State's DNA expert concerning the statistical meaning of the partial DNA profile comparison, presented the testimony of his own expert and argued before the jury that in the light of the partial 8 loci match and the State's various DNA reports, the DNA evidence should be given little weight. Accordingly, defendant's reliance of *Wright* is misplaced.

¶ 50    Furthermore, even if defense counsel would have moved to exclude DNA evidence in its entirety, defendant cannot show that such a motion would have been granted by the trial court. See *People v. Mitchell*, 2011 IL App (1st) 083143, ¶ 35 ("In the absence of Illinois authority that DNA evidence is excludable as a matter of law based on the evidence being 'too

- 11 -

inconclusive,' we reject the instant defendant's claim that the equivocal nature of [the] expert['s] opinion rendered his testimony legally inadmissible" and holding that a match at just 4 loci was relevant and admissible); *cf. People v. Smith*, 2012 IL App (1st) 102354, ¶¶ 170, 177 (Gordon, J., dissenting) (concluding that counsel's failure to exclude the DNA evidence in its entirety fell below a reasonable standard when a 6 loci match was "lacking in probative value").

¶ 51    Next, defendant's claim that defense counsel's performance was unreasonable for failing to request a DNA database search to determine how many individuals in the Illinois database matched at 8 loci lacks merit. Aside from being a matter of trial strategy, defense counsel, through the defense expert's testimony made it clear to the jury that there may had been many others that could not have been excluded at 8 loci. Specifically, Dr. Muller testified that the first report from 2007 produced a total of 21,504 different genetic profiles, Jackson's new report with the new data included had 64,512 possible profiles, and the final ISP report issued by Gordon produced 86,016 possible profiles.

¶ 52    Defendant's reliance on *People v. Watson*, 2012 IL App (2d) 091328, in arguing that his counsel was deficient for failing to move for a database search to challenge the statistical probability testimony is misplaced. In *Watson*, the only evidence connecting the defendant to the crime was a partial DNA match and defense counsel asked the State's DNA expert only three questions on cross-examination. *Id.* ¶ 26. Defense counsel did not point out through either cross-examination or argument to the jury that the lack of a complete DNA sample was critical because that missing DNA evidence could exclude the defendant as being the one who committed the crime. *Id.* This court thus found that defense counsel's representation of the defendant constituted ineffective assistance of counsel because "it was objectively unreasonable for counsel to refrain from pursuing, *in any regard*, a challenge to the *significance*, if any, of the alleged [partial DNA match]." (Emphases in original.) *Id.* ¶ 31. Here, as previously mentioned, defense counsel challenged the DNA evidence wherever possible, engaged in vigorous cross-examination, and presented testimony of the defense expert to rebut the testimony of the State's DNA experts. Accordingly, *Watson* is clearly distinguishable from the instant case.

¶ 53    Furthermore, defendant failed to show that he was prejudiced by counsel's alleged deficient performance when the remaining evidence against him presented at trial was substantial. To prevail on an ineffective assistance of counsel claim, a defendant must satisfy both the performance and prejudice prongs of *Strickland. People v. Evans*, 209 Ill. 2d at 220. Regarding the second *Strickland* prong, a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome or, put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair. *Id.* A reasonable probability of a different result is not merely a possibility of a different result. *Id.*

¶ 54    At trial, defendant was identified by Brandon Grzesiak as the man outside Maggy's shortly before the murders and as the man holding a gun in the store video. In addition, defendant's previous address matching one of the lottery tickets found at the crime scene as well as defendant's cell phone records corroborated Grzesiak's identification. Those records indicate that, after leaving the area around his girlfriend's house that morning, defendant's cell phone was near Maggy's around the time of the murders. Based on the entire evidence presented at trial, we cannot say that but for counsel's alleged deficient performance in failing to ask for a

complete bar of the DNA evidence or in failing to request a DNA database search, there was a reasonable probability that the result of defendant's trial would have been different. Accordingly, defendant's ineffective assistance of counsel claims fail on this basis as well.

¶ 55                                    *Frye* Hearing

¶ 56    Defendant next argues that the trial court erred when it determined that a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), was unnecessary on the admissibility of historical cell site analysis. The State introduced this evidence to establish that defendant was in the vicinity of the crimes during the time period surrounding the commission of the crimes. Defendant contends that a *Frye* hearing was necessary before cell site data could be admitted because locating a phone in relation to the cell sites to which it connected is a methodology that has not gained general acceptance and is "new" or "novel" for purposes of *Frye*.

¶ 57    In Illinois, the admission of expert testimony is governed by the standard first expressed in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004). Known as the "general acceptance" test, the *Frye* standard dictates that scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. In this context, "general acceptance" does not mean universal acceptance, and it does not require that the methodology in question be accepted by unanimity, consensus, or even a majority of experts. *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78 (2002). Instead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field. *Id.* at 77. Significantly, the *Frye* test applies only to "new" or "novel" scientific methodologies. *Id.* at 78-79. Generally speaking, a scientific methodology is considered "new" or "novel" if it is " 'original or striking' " or "does 'not resembl[e] something formerly known' " or used. *Id.* at 79 (quoting Webster's Third New International Dictionary 1546 (1993)). Our standard of review is *de novo*. *Simons*, 213 Ill. 2d at 530-31. On appeal, when determining whether a *Frye* hearing was warranted, a reviewing court is free to consider court opinions from other jurisdictions. *Id.* at 531.

¶ 58    Here, the trial court did not err in denying defendant's request for a *Frye* hearing because Agent Raschke's testimony regarding historical cell site information was not the product of new or novel scientific principle and methodology. The State presented a map showing the locations of the cell sites to which defendant's phone connected and the times at which those connections occurred. The State argues that this is not scientific evidence, because creating the map involved no more than reading defendant's cell phone records and transferring that information to a map. Reading the coordinates of cell sites from phone records and plotting them on a map is not a scientific procedure or technique, and the *Frye* standard is not applicable. *State v. Patton*, 419 S.W.3d 125, 129-30 (Mo. Ct. App. 2013).

¶ 59    Regardless whether historical cell site evidence is scientific, the use of cell phone location records to determine the general location of a cell phone is not "new" or "novel" and has been widely accepted as reliable by numerous courts throughout the nation. See, *e.g.*, *People v. Powell*, 2015 IL App (5th) 120258-U, ¶ 87 ("[t]his methodology has consistently been deemed reliable and has been widely accepted by numerous courts"); *Stevenson v. State*, 112 A.3d 959, 968 (Md. Ct. Spec. App. 2015) (holding that the circuit court properly declined to conduct a *Frye* hearing into the use of call detail records to determine the time and location of

defendant's cell phone's connection to particular cell towers and noting the technique's reliability and wide acceptance by numerous courts); *United States v. Schaffer*, 439 Fed. App'x 344, 347 (5th Cir. 2011) (concluding that the field of "historical cell site analysis" was "neither untested nor unestablished"); *United States v. Dean*, No. 09 CR 446, 2012 WL 6568229, at *5 (N.D. Ill. Dec. 14, 2012) (finding that expert testimony relating to cell site records was reliable and would assist the trier of fact to determine a fact at issue, and noting that "such testimony is generally accepted in the Seventh Circuit"); *United States v. Fama*, No. 12-CR-186, 2012 WL 6102700, at *3 (E.D.N.Y. Dec. 10, 2012) (noting that "[n]umerous federal courts have found similar testimony reliable and admissible" (internal quotation marks omitted)); *United States v. Jones*, 918 F. Supp. 2d 1, 5 (D.D.C. 2013) (collecting cases that conclude that historical cell site analysis is neither untested nor unestablished); *United States v. Rosario*, No. 09-CR-415-2, 2014 WL 6076364, at *2-3 (S.D.N.Y. Nov. 14, 2014) (concluding that an FBI Special Agent's cell-site analysis testimony was based on techniques sufficiently reliable to be admitted under Federal Rule of Evidence 702 (Fed. R. Evid. 702)); *State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271, at ¶ 29 ("We agree with those federal courts concluding that cell-site analysis testimony, like that given by Horan, is reliable."); *Pullin v. State*, 534 S.E.2d 69, 71 (Ga. 2000) ("the technology in question has reached a scientific stage of verifiable certainty to be admissible in the trial of this case").

¶ 60     Defendant cites *United States v. Evans*, 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012), claiming that historical cell site analysis is a new methodology for purposes of *Frye*. In *Evans*, a cell site expert used a "granulization theory" to estimate the location from which several of the defendant's phone calls had originated. *Evans*, 892 F. Supp. 2d at 952-56. Observing that factors such as topography, physical obstructions, and the signal strength of another tower can impact whether a cell phone connects to the tower closest to it, the court noted, however, that the granulization theory did not fully account for the fact that a cell phone does not always use the closest tower. *Id.* at 953, 956-57. Further noting, among other things, that the granulization theory had not been generally accepted in the scientific community, the court held that the theory was unreliable and that the expert could not testify about it. *Id.* at 955-57.

¶ 61     Here, the defendant's reliance on *Evans* is misplaced because Agent Raschke did not use a granulization theory to estimate the locations from where the defendant's calls had been made. Agent Raschke rather used historical data from the defendant's cell phone records to demonstrate the towers that the defendant's phone had actually activated. Accordingly, defendant's reliance on Evans is misplaced. See *People v. Powell*, 2015 IL App (5th) 120258-U, ¶ 87 (and cases cited therein) (observing numerous courts that have limited *Evans* to its facts). Accordingly, based on the general acceptance of the underlying techniques, we find that the trial court did not err in declining to conduct a *Frye* hearing when the use of historical cell site analysis was not the product of new or novel scientific principle or methodology.

¶ 62                          Agent Raschke's Testimony

¶ 63     Defendant argues that he is entitled to a new trial because the trial court erroneously allowed FBI Agent Raschke to testify without sufficient foundation to the conclusion that defendant's phone was "at or near" Maggy's when the crimes were committed. According to defendant, Raschke used defendant's call detail records to approximate the location of his phone but Raschke did not testify regarding how the approximation was done. Defendant

contends that Raschke never testified regarding the reach of each tower, he never performed any confirmatory testing in his analysis, and he never made any calculations to determine the actual reach of each tower or even an estimated reach of each tower.

¶ 64    Defendant does not dispute that Raschke was qualified as an expert to testify in the field of historical cell site analysis. Under Rule 705 of the Illinois Rules of Evidence (Ill. R. Evid. 705 (eff. Jan. 1, 2011)), an expert is allowed to give an opinion without divulging the basis for it and shifts the burden to the opposing party to elicit and to explore the underlying facts or data on cross-examination. *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 37. Rule 705, codified preexisting case law placing the burden on the adverse party during cross-examination to elicit facts underlying expert opinion. *Id.*; Ill. R. Evid., Committee Commentary (eff. Jan. 1, 2011) (the newly enacted Illinois Rules of Evidence merely codified existing case law whenever the Illinois Supreme Court "had clearly spoken"); *People v. Williams*, 238 Ill. 2d 125, 137 (2010) (observing that in *Wilson v. Clark*, 84 Ill. 2d 186 (1981), the Illinois Supreme Court had adopted the identical Rule 705 of the Federal Rules of Evidence); *cf. People v. Safford*, 392 Ill. App. 3d 212, 221 (2009) (for expert testimony to be admissible, the proponent must lay an adequate foundation establishing that the information on which the expert based his or her opinion is reliable). Whether the foundational requirements have been met is a question of law that we review *de novo. Id.*

¶ 65    Here, contrary to defendant's argument, the record indicates that although Raschke was qualified as an expert to testify in the field of historical cell site analysis, he thoroughly explained the basis for his testimony establishing a sufficient foundation for his findings. Raschke testified that he based his findings on how cell phones and cell towers interact and explained that a cell phone was basically a radio that has a transmitter and a receiver. When a call is placed, the phone sends a signal with the information to the cell phone; when the cell phone receives a call, the cell tower sends a signal with that information to the cell phone. At the time when that interaction takes place, a call detail record is generated and the call detail record will indicate the time and date that occurred, which phones were involved in that call, and then which cell towers were being used during that call.

¶ 66    Raschke further explained that if a user moves throughout the network during a phone call, the towers and sectors employed will continuously change. Raschke testified that a cell tower closest in proximity to a cell phone will generally give the strongest signal but that coverage areas can sometimes overlap. Sometimes, an obstruction may prevent the closest tower from providing the strongest signal, depending on where the phone was located. The cell phone switches from tower to tower to ensure the best signal. Raschke explained that a call detail record is generated with each call indicating the time and date, the phone used and cell towers that were used. He testified that historical cell site analysis involves the analyst using his training and expertise with cellular technology and call detail records to analyze and interpret those records and tower lists from the phone company to determine the approximate locations where a phone was when a call was placed and received.

¶ 67    Using defendant's cell phone records and a map of the locations of the U.S. Cellullar towers in July 2005, Raschke traced the towers used by defendant's phone from 10 a.m. through 1:24 p.m., showing that his phone moved from the general area around his girlfriend's house up north to the general area of Maggy's around the time of the murders and then back to the general area around his girlfriend's house. Raschke did not attempt to identify the exact locations or addresses from where the calls from the defendant's phone had been made.

Instead, Raschke acknowledged that he did not know the specific location of defendant's cell phone at those times and made general references to the towers and sectors that had been used during the calls, as plotted on the map.

¶ 68    Furthermore, defendant's attorney performed a vigorous cross-examination regarding the process, the methodology used, and highlighted the fact that Raschke never testified regarding the reach of each tower nor made any calculations to determine the actual reach of each tower. Raschke explained during cross-examination that he did not do those things because tower configurations were different in 2005 than at the time of his analysis and "[t]here's just been too much change for that [confirmatory testing]." Moreover, since Raschke testified as an expert under Illinois Rule of Evidence 705, any issues regarding the details Raschke provided to support his opinion that defendant's cell phone was in the area of Maggy's during the time when the crimes occurred went to the weight, not the admissibility of the evidence. See *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 38. But Raschke's testimony about the methodology and his reading of the call detail records for defendant's phone established a sufficient foundation for his testimony. Therefore, the trial court did not err in admitting Rachke's testimony regarding the time and location of the cell towers used by defendant's phone.

¶ 69                              The Witness's Comment

¶ 70    Defendant next contends that he is entitled to a new trial where the jury heard Detective McCormack's improper and prejudicial testimony that he searched through "criminal histories" in the Chicago police database. Detective McCormack testified that he ran the lottery number 5157 through the police database as a south side address, came up with numerous people, and clicked on their "criminal histories." Defendant claims that although the comment was stricken, Detective McCormack's testimony that he found an association between the number 5157 and defendant's name was prejudicial, improper other-crimes evidence that the jury should never have heard.

¶ 71    Evidence of collateral crimes, *i.e.*, crimes for which the defendant is not on trial, is inadmissible to merely establish the defendant's propensity to commit crimes. *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). The improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission. *People v. Nieves*, 193 Ill. 2d 513, 530 (2000). Admission of other-crimes evidence is reviewed under an abuse of discretion standard. *People v. Donoho*, 204 Ill. 2d 159, 182-83 (2003). A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or where no reasonable person would take the view adopted by the trial court. *Id.* at 182.

¶ 72    Here, there was no direct evidence at the conviction stage of the trial that the defendant had engaged in criminal conduct prior to the offense for which he was being tried. At most, Detective McCormack's testimony may have raised an inference in the jurors' minds that the defendant had a criminal history. However, the record reflects that the trial court promptly struck Detective McCormack's comment regarding the "criminal history" following defense counsel's objection. Nonetheless, defendant argues that the trial court abused its discretion when it failed to prevent the State from eliciting testimony connecting lottery ticket number with defendant's name. We disagree.

¶ 73    Steps in the investigation of a crime and events leading up to an arrest are relevant when necessary and important to a full explanation of the State's case to the trier of fact. *People v. Lewis*, 165 Ill. 2d 305, 346 (1995) (citing *People v. Hayes*, 139 Ill. 2d 89, 130 (1990)).

"[E]vidence of other-crimes is not admissible merely to show how the investigation unfolded *unless* such evidence is also relevant to specifically connect the defendant with the crimes for which he is being tried." (Emphasis in original.) *Id.* In the instant matter, Detective McCormack's testimony connecting defendant's name to the lottery ticket with the number 5157 recovered from the crime scene was important for the State's case to unveil how the investigation leading to defendant's identification proceeded. Specifically, following Detective McCormack's investigation, a photographic array was created containing defendant's picture that was shown to Brandon Grzesiak who ultimately identified defendant as the person sitting outside Maggy's just minutes before the crime was committed.

¶ 74     We find that the cases defendant cites to support his contention that the trial judge abused his discretion are inapposite. For instance, in *People v. Barnes*, 182 Ill. App. 3d 75 (1989), an unlawful use of firearms case, the State questioned the defendant, his companion, and three police officers about a large amount of cash the defendant had at the time he allegedly committed the crime. The State again emphasized the defendant's possession of the cash in closing argument. *Id.* at 80-83. We held that such bad character evidence was inadmissible because "clearly the amount of cash recovered from defendant's possession was irrelevant to proving he was guilty of the unlawful use of a firearm. Yet, from the very onset of trial *** the jury was bombarded with this irrelevant evidence, which took on the appearance of being a central issue to be considered by the jury in its assessment of defendant's credibility and which could only have suggested to the jury that the cash was obtained through some illegal means." *Id.* at 83-84.

¶ 75     Similarly, in *People v. Harbold*, 124 Ill. App. 3d 363 (1984), this court found that the prosecutor intentionally committed misconduct by eliciting testimony concerning weapons found at the defendant's residence. The prosecutor in *Harbold* offered evidence of weapons as "indicative of the type of person [defendant was]." *Id.* at 384. This court found that the error was not harmless where the trial court's admonishment to the jury to disregard any reference to a weapon was made several minutes after the reference and where the prosecutor engaged in a "consistent tactic of bolstering its case with irrelevancy." *Id.*

¶ 76     Here, unlike *Barnes* and *Harbold*, the single reference to "criminal history," which was promptly stricken by the trial court, and Detective McCormack's testimony associating defendant's name to the lottery ticket did not prejudice defendant or deny him a fair trial considering the entire evidence presented at trial. See *People v. Evans*, 209 Ill. 2d 194, 219, 221 (2004) (holding that admission of defendant's statement that "I come up here a lot" when escorted to his jail cell "was brief and nonspecific" and "overshadowed by extensive evidence of defendant's guilt"); *People v. Towns*, 157 Ill. 2d 90, 106-07 (1993) (rejecting defendant's ineffective assistance of counsel claim, holding that the defendant was not prejudiced by the introduction of the remarks, " 'I would go back to jail' " and " 'I can't go back to jail' ").

¶ 77     The evidence at trial against defendant was substantial. Brandon Grzesiak identified defendant as the person that he saw outside of Maggy's just minutes before the crimes were committed. Before seeing defendant in the video recovered in the store, Grzesiak provided a description of him and helped the detectives create a sketch of the suspect. Fifteen days after the murders, Grzesiak identified defendant as the person he saw at the bus stop and as the person in the store video. On April 12, 2007, Grzesiak viewed a physical lineup and again identified defendant.

¶ 78     Defendant contends that the evidence against defendant was "littered with weaknesses and, at minimum, closely balanced." Defendant claims that Grzesiak's identification of defendant was doubtful since he failed to identify defendant in a photo array. However, assuming that this was true,[2] the testimony that a prosecution witness looked through a photo book without identifying defendant was harmless in light of overwhelming identification of defendant in a photo array, in a lineup, and at trial. See *People v. Hayes*, 168 Ill. App. 3d 816 (1988). In addition, defendant's cell phone records and the partial DNA evidence recovered underneath Guerrero's fingernails corroborated Grzesiak's identification. Therefore, in the light of the substantial evidence against defendant, even assuming that the trial court erred in allowing the testimony of Detective McCormack associating defendant's name with one of his addresses and his lottery ticket number, the error was harmless as it did not prejudice defendant or deprive him of a fair trial.

¶ 79                    Prosecutor's Comments During Rebuttal

¶ 80     Defendant next contends that the prosecutor made improper comments during rebuttal when arguing to the jury that defendant's theory of defense was that there was a "grand conspiracy" against him involving all the State's witnesses. According to defendant, aside from being a mischaracterization of defendant's defense, the State's remarks misled the jury into thinking that they had to find the existence of a "frame up" in order to acquit. Defendant urges this court to reverse his conviction and remand for a new trial when the prosecutor's argument distorted the burden of proof and violated his right to a fair trial.

¶ 81     Defendant acknowledges that he did not object to this error at trial and asks us to review the forfeited error under the plain error doctrine. Under plain error review, we will grant relief to a defendant in either of two circumstances: (1) if the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) if the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Under the closely balanced prong of plain error review, the defendant must show prejudicial error. *Herron*, 215 Ill. 2d at 187. The defendant bears the burden of persuasion with respect to prejudice. *People v. Lewis*, 2015 IL App (1st) 130171, ¶ 31.

¶ 82     In presenting a closing argument, the prosecutor is allowed a great deal of latitude and is entitled to argue all reasonable inferences from the evidence. *People v. Jones*, 2014 IL App (3d) 121016, ¶ 37. The prosecutor is allowed to comment on the evidence and reasonable inferences from the evidence, including a defendant's credibility or the credibility of the defense's theory of the case. *Id.* The standard of review applied to arguments by counsel is similar to the standard used in deciding whether a plain error was made: comments constitute reversible error only when they engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from those comments. *People v. Henderson*, 142 Ill. 2d 258, 323 (1990). During rebuttal, prosecutors are entitled to respond to comments made by the defendant " 'which clearly invite a response.' " *People v. Ramos*, 396 Ill. App. 3d 869, 875 (2009) (quoting *People v. Kliner*, 185 Ill. 2d 81, 154 (1998)). As with other aspects of argument, rebuttal must be considered in context with the other portions, including defendant's argument. *Id.*

---

[2]The record is not clear on this matter.

¶ 83    Here, after reviewing defendant's closing argument and the State's response, we find that the State's remarks regarding a grand conspiracy theory were invited by defendant's remarks in the closing argument. Defendant's closing argument initially began by inferring that the entire evidence at trial was distorted: "[t]his case illustrates that the police may have started with the very best of intention *** But then—and maybe it was the media attention or the pressure from the community to solve this horrible crime. And it was horrible. But it illustrates what happens when the police and the ISP crime lab get over anxious. They discount it instead of paying attention to it. They reject the evidence that doesn't go with their theory. And they do whatever it takes to make it fit."

¶ 84    From there the argument addressed and questioned the believability of every State's witness. Counsel stated that, "it made Detective McCormack's job easier because now they have a target. He and fellow detectives went about trying to build their case against [defendant]." Counsel then attacked the testimony of Brandon Grzesiak stating that "Brandon had a flawed opportunity to observe. It led to his flawed identification of my client." Counsel also added that "[Grzesiak] knew who he was supposed to pick out. It is not just clues, inadvertent or not by the police. But pressure to perform. To identify the man."

¶ 85    Next, counsel referred to testimony of the U.S. Cellular representative Solandia Haddock and argued that she could not identify at trial the phone in the video as the exact phone that was associated with defendant. The testimony of Agent Raschke was questioned along with the cell phone evidence in the case, which according to counsel "was nothing more than a red hearing, ladies and gentleman. Because agent Raschke had to admit it didn't prove that the phone was inside that circle which contained Maggy's Foods."

¶ 86    The argument continued with counsel's lengthy remarks on the DNA evidence and the CPD's investigation including the lottery tickets that were recovered from the crime scene and questioning the detectives' motives for investigating the lottery ticket with the number 5157. For instance, counsel noted that "all the State's Illinois Police crime lab analyst that did DNA work in this case knew the target was my client *** So CPD had selected [defendant] as the target. So, their analysis which excluded [defendant], and nobody disputes that *** simply wouldn't do. So ISP then went back and tried to build a scientific case against [defendant]." Counsel also stated the following regarding the DNA testing in this case:

    "Here Orchid Cellmark, the blind analysis, had one answer. Davere Jackson's report had a different answer. Davere Jackson's 2012 report had another [sic], yet another answer. And the ISP 2012 had still another.

    Why these last minute interpretations [sic]. To try to make the DNA case against my client stick. Where it doesn't stick. They want to hide behind their protocols. The change in the way they do their job. Really. Because how can a protocol that allows untold re and re and re-interpretations ever result in anything reliable. Ever been trustworthy. How can analysts under these kinds of protocol solidly interpret data. They certainly couldn't in this case.

    Don't let them fool you in calling what was done here science, ladies and gentleman. They are hiding behind what it should have been. While just making excuses for why it wasn't."

¶ 87    In short, defendant questioned the veracity and believability of every single piece of evidence in the State's case-in-chief. Moreover, counsel anticipated that the State "may get up

here and say ladies and gentlemen, [defendant] must be the luckiest man in the universe. With all of this circumstantial evidence against him."

¶ 88    Given the nature and the extent of defendant's accusation, the prosecutor's response was in the realm of invited comment:

"After listening to that closing argument, this man sitting right over here must be the victim of the grandest conspiracy to frame you will ever hear. Think about it ladies and gentlemen. Based on what Miss Lisco just told you, all the witnesses in this entire case, no matter where they are from, no matter what they do, they are all out to get him. They must be all out to get [defendant]. All of these witnesses came into this courtroom, raised their right hand and decided, independent of one another, without getting together beforehand, decided let's frame him. And then let that real killer go.
            ***

And then, all of these agencies *** and all of these people *** they have all conspired against [defendant].
            ***

Besides Brandon Grzesiak, you have Nicholas Guerrerro's fingernails involved in this conspiracy to frame. You have Orchid Cellmark scientists. They don't even live and work in this state. They want to put a case on him.
            ***

In addition to all those people, conspiring to frame him, Mr. Hammoudeh, come on in and bring that video camera with you. Let's get that video involved in this conspiracy. And the Illinois State Lottery Commission. Come on in. Let's frame this guy. Let the real killer go. We are not going to stop here. US Cellular, a big corporation. Come on in. Say this guy bought a phone, just three weeks before these double murders. And, in addition to US Cellular, the FBI. Come on. Joe [Raschke], come on in. Come on in and put a case on this guy. And now, ladies and gentlemen, in addition to all those people, all this, we have the Chicago Police Department.
            ***

[CPD] still sent [clothes] to the lab. Does that sound like a frame job? By the way, negative for blood. Does that sound like a frame job?
            ***

And with all those people, and all of those agencies, we now learn from it, from Miss Lisco's closing argument, that the Guerrero family and the Rodriguez family, they are in the conspiracy too. They want to frame [defendant] too. And all the people in the community by Maggy's Food Store. They want to put a case on him too. And let the real killer go free.
            ***

If she is calling Davere Jackson and Pauline Gordon liars, because they have some interest, bias, or motive, well, what about the fingerprint expert from the crime lab. Shouldn't they be putting a frame job together against him too.
            ***

Their witnesses say he can't be excluded. Not once, twice. . . I guess, I guess, I hate to say this, but maybe Mr. Muller is involved in this conspiracy to frame too.

- 20 -

\*\*\*

> Oh, by the way, if [scientists] are overwhelmed like she said, then when did they have the time to frame an innocent man.
> \*\*\*
> This is the defense of deperation. That's what it is.
> \*\*\*
> The scientists at this crime lab, she suggesting is involved in this grand conspiracy, didn't find his fringerprints on the items here."

¶ 89    Defendant claims that these comments amount to an accusation of conspiracy and encumbered him with the burden to show that the State's witnesses had conspired to frame him. We disagree. As the record clearly reflects, the State's rebuttal closing was comprised significantly of responses to defendant's argument. Neither the portions quoted in the brief nor the complete argument demonstrates any impropriety. Instead, defendant responded fairly to defendant's accusations. *People v. Ramos*, 396 Ill. App. 3d 869, 876-77 (2009); *People v. Phillips*, 392 Ill. App. 3d 243, 275 (2009).

¶ 90    Furthermore, the State's rebuttal argument never approached the position that defendant had to prove the State's witnesses were lying or had fabricated evidence in order for defendant to be acquitted. The comments were invited by the defense's closing argument that the State's witnesses could not and should not be believed. See *People v. Temple*, 2014 IL App (1st) 111653, ¶ 74 ("the State's comments about a conspiracy were a direct response to the defense's attack on the credibility of the state witnesses and therefore was not a misstatement of the law or an attempt to distort the burden of proof" (internal quotation marks omitted)). Consequently, we find no impropriety in any aspect of the State's rebuttal closing argument.

¶ 91    We also find the case on which defendant relies to be inapplicable. See *People v. Wilson*, 199 Ill. App. 3d 792 (1990). In *Wilson*, the defendant argued that the State had improperly shifted the burden during closing by asking the jurors whether it was " 'curious to anyone the defense would have you believe everybody in this case is guilty except the Defendant.' " *Id.* at 796. This court found that the comments sent a message to the jury that the defendant had a burden to show the State's witnesses had lied in order to prove his innocence, improperly shifting the burden. *Id.* at 797. In *Wilson*, this court reasoned that "[t]o inform a jury that to believe the defense witnesses the jury must find that each of the State's witnesses was lying is a misstatement of law." *Id.* at 796.

¶ 92    Here, in contrast, the State's comments about a conspiracy were a direct response to the defense's attack on the credibility of the State witnesses and therefore "was not a misstatement of the law or an attempt to distort the burden of proof." See *People v. Lash*, 252 Ill. App. 3d 239, 253 (1993) (stating that "[c]learly, whether defendant's theory of defense is reasonable in light of the evidence produced is within the scope of proper rebuttal comment"). In addition, *Wilson* was decided before the supreme court's decisions in *Banks* and *Coleman*, where the supreme court distinguished situations where a prosecutor permissibly argued that a jury would have to believe the State's witnesses were lying in order to believe the defendant's version of events versus improperly arguing that the jury would have to believe the State's witnesses were lying in order to acquit defendant. *People v. Banks*, 237 Ill. 2d 154, 184-85 (2010) (citing *People v. Coleman*, 158 Ill. 2d 319, 346 (1994)). Here, the prosecutor never

argued that the jury would have to believe the State's witnesses were lying in order to acquit defendant. Accordingly, defendant's reliance on *Wilson* is misplaced.

¶ 93    Furthermore, even assuming *arguendo* that an error occurred, there was no plain error because, as established previously, the evidence at trial was not closely balanced. Likewise, defendant cannot establish plain error under the second prong of the plain error analysis. Under the second prong, the defendant must prove there was plain error and that the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187. Error in closing argument does not fall into the type of error recognized as structural. *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 78. Having found no error, defendant is not entitled to relief under the plain error review. See *Ramos*, 396 Ill. App. 3d at 873. Therefore, defendant's claim fails on appeal.

¶ 94                                    CONCLUSION

¶ 95    Based on the foregoing, we affirm the judgment of the trial court.

¶ 96    Affirmed.

¶ 97    JUSTICE HYMAN, dissenting.

¶ 98    I believe the trial court abused its discretion in refusing to grant Fountain a meaningful continuance to prepare for the State's new DNA evidence, disclosed mere days before trial. This evidence, which is highly unconvincing and open to subjective interpretations, likely had an outsize effect on the jury's verdict. The rest of the State's case against Fountain was weak, particularly the eyewitness identification and the cell-phone evidence. Given all this, I believe the trial court's refusal to grant a meaningful continuance prejudiced Fountain. I also believe that the majority's ill-considered opinion does a disservice to the law governing DNA evidence.

¶ 99              The Trial Court Should Have Granted a Meaningful Continuance

¶ 100   The majority concludes that the trial court did not abuse its discretion in refusing a meaningful continuance to review the additional DNA evidence promulgated by the State mere days before the beginning of trial. I disagree; given the impact and importance of this evidence, the trial court should have allotted defense counsel more time to adequately review it.

¶ 101   As the majority points out, the trial court considered the issue several times, but that does not insulate the decision from review. The trial court seemed to base its decision, in part, on the fact that the DNA experts were not scheduled to testify until several days into the trial, so Fountain's counsel would have time to prepare. Never mind the fact that Fountain's counsel would be spending those intervening days conducting the actual trial and preparing for the first set of witnesses. We should not expect criminal defense attorneys (or prosecutors) to effectively conduct pretrial investigation on nuanced, multifaceted, and consequential matters while also managing the day-to-day demands of an on-going trial.

¶ 102                     Factors Weigh in Favor of Granting Meaningful Continuance

¶ 103          Whether the trial court should have granted a meaningful continuance rests on the consideration of a number of factors. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). Each of these factors weighs in Fountain's favor. Fountain's counsel diligently requested the continuance immediately after the State disclosed the new DNA evidence (about which more will be said). It is hard to see how the interests of justice have been served by the trial court's denial. Surely there can be no speedy-trial concerns; after six years, another week or two would not have changed matters. And Fountain was faced with grave criminal charges, and a decades-long prison sentence.

¶ 104          The case's history also weighs in Fountain's favor. The majority correctly notes that this case had been on the trial court's docket for six years, but it is worth remembering why. For the first three years of its pendency, the State was pursuing the death penalty against Fountain. Because of this, defense counsel spent (as required) a large portion of its pretrial time preparing for a possible capital sentencing hearing.

¶ 105          Throughout that time, the trial court pushed defense counsel to prepare faster. For example, when defense counsel needed time to have Fountain's mental state evaluated, the trial court stated that this was "just another way for you to buy more time and delay the case that much longer." Once the death penalty was taken off the table (by legislative action), the case accelerated, and trial was set for July 2012.

¶ 106          But, not until May 2012, did the State disclose that the cell-phone-tower evidence (discussed in detail later). That necessitated a number of continuances as defense counsel tried to prepare for this new scientific evidence. Yet the trial court insisted on setting an October 22 trial date even though defense counsel protested that they were not ready to proceed due to the new cell-phone evidence. When Fountain's counsel stated that it would file a *Frye* motion challenging that evidence, the trial court said, "I wish I had a penny for every time I mentioned in the record how old this case is" and repeatedly stated that October 22 was a firm trial date.

¶ 107          Just four days before the trial date, on October 18, the State *first* disclosed that Davere Jackson had written a new DNA report. Fountain's counsel asked for a continuance, and the trial court told the parties to return to court the next day: "I've been barking like a sea lion asking for fish for the last year and a half trying to get this case going." On Friday, October 19, defense counsel moved to bar Jackson's testimony and stated that they needed to consult an expert. Meanwhile, the State still had not disclosed yet another new report from the Illinois State Police (ISP) (it did so that Friday afternoon). The court agreed to hold the case until Monday, October 22, stating that it might give defense counsel a continuance.

¶ 108          Presumably, defense counsel spent an unpleasantly stressful weekend. In court on October 22, the state tendered yet more discovery to defense counsel. The trial court asked counsel, "Why do you need a day right now?" To which defense counsel responded, "Knowing what the court's position is on the continuance because you told us last week—we are asking for just a day, one day so that we can do our due diligence *** with documents that were just tendered as well as talking to our consultant." The trial court granted this paltry one-day continuance because it did not want to change the witnesses' travel plans and refused to bar Jackson's testimony.

¶ 109          When the trial court complained about how long the case had been sitting on the docket, its complaints were justified—but directed at the wrong party. The late DNA disclosures were not

the first time the State's decisions forced Fountain's counsel to change its trial strategy and beg for more time to prepare.

¶ 110    Given this context, it is completely sensible that Fountain's counsel would seek only "one day" as a continuance. Though Fountain's counsel gave reasons for needing more time, the trial court had made it amply clear, over the course of years, that it was determined to hold the trial as soon as possible and would have been unsympathetic to any reasonable request. In the face of this unyielding attitude, Fountain's counsel cannot be faulted for asking for a crumb. In paragraph 40, the majority reasons that because Fountain's counsel asked for and received one day, that ends the matter. My colleagues fail to appreciate that Fountain's counsel was stuck between a rock and a hard place. Defense counsel should not have to choose between provoking or exasperating the trial judge and harming a client's prospects.

¶ 111    There would have been some inconvenience to the parties and witnesses had there been a lengthy delay. At oral argument, Fountain's counsel specified that a "meaningful" continuance would have been three weeks. (In paragraph 40, the majority erroneously characterizes this as speculation on my part.) But expert witnesses already were scheduled to fly into Chicago from out of state for their testimony. On the other hand, it seems contrary that Fountain should bear the burden of that problem when the State disclosed these reports at an unduly late date. Perhaps the better practice would have been to bar these new reports (as Fountain's trial counsel requested).

¶ 112                    Complexity of the Evidence Required Meaningful Continuance
¶ 113                    *Complexity Favors Leniency on Additional Time*
¶ 114    The majority already has described the substance of the DNA testimony without explaining this important evidence. This is not a situation where a traditional "battle of the experts" between the State and the defense gave rise to a claim that the jury should have believed one side's expert over another. This case was far more troubling, because the State's experts did not even agree with each other!

¶ 115    The State DNA experts ultimately promulgated four—yes, four—separate reports on the minor-profile DNA: from Cellmark labs in 2006 (testified to by Sarah Walker), from Davere Jackson of the ISP in 2007, from Pauline Gordon of the ISP in 2012, and another report from Jackson in 2012 (these last two reports being the cause of the request for continuance). All four reports interpreted the same data but came to four different conclusions.

¶ 116    The Cellmark technicians analyzed the DNA (a "mixed" profile from two different persons), which had been taken from under Nicholas Guerrero's fingernails. The mixed profile needed to be separated into its components: the "major" profile from Guerrero and the "minor" profile from an unknown person, presumably the murderer. Each profile would contain DNA alleles, which are genes at specific locations, or "loci" on a chromosome. Cellmark produced an "electropherogram" showing the presence of these alleles at 14 loci. (Only 13 of these loci are at issue; the fourteenth locus was the X/Y locus showing male contributors.) It was this electropherogram printout that each DNA expert was required to interpret. The printout looks like an EKG, with jagged "peaks" of various heights.

¶ 117    At the most basic level, each expert had to determine whether each peak was high enough to show the presence of DNA allele. A peak showed the presence of DNA; a flat line would show that DNA was not present. Since Guerrero was one of the contributors to the mixed

profile, the peaks tended to be high at points known to match Guerrero's own DNA profile. But the peaks from the second, "minor" contributor were smaller, and of various sizes. For those peaks, there was a wide range of interpretations. The experts apparently had no agreed-on standard as to what size peak was "enough" to draw a conclusion for a particular locus. Quite literally, the State experts' disagreement boiled down to "that's not enough" versus "sure it is." Here is a summary(taken from defense exhibit No. 17) showing the disagreement between the four reports:

| Locus | Fountain | Cellmark 9/26/06 | ISP 3/13/07 | Jackson 10/17/12 | ISP 10/19/12 |
|---|---|---|---|---|---|
| D3S1358 | 16/16 | Not used | 15/16; 16/16 | 15/16; 16/16 | 15/16;16/16 |
| vWA | 15/16 | 15/16 | 15/16 | 15/16 | 15/16 |
| FGA | 24/25 | 24/25 | 24/25 | 24/25 | 24/25 |
| D8S1179 | 14/16 | Not used | 16/16 | 13/16;14/16;16/16 | 13/16;14/16 |
| D21S11 | 28/32.2 | 28/32.2 | 28/32.2 | 28/32.2 | 28/32.2 |
| D18S51 | 18/19 | Not used | Not used | Not used | Not used |
| D5S818 | 12/12 | 12/12 | 12/12;12/13 | 12/12;12/13 | 12/12;12/13 |
| D13S317 | 11/12 | Not used | 12/8; 12/9; 12/10;12/11; 12/12;12/13;12/14;12/15 | 12/8;12/9;12/10; 12/11;12/12;12/13; 12/14; 12/15 | 12/8; 12/9; 12/10;12/11; 12/12;12/13; 12/14; 12/15 |
| D7S820 | 8/12 | Not used | 12/7; 12/8; 12/9; 12/10; 12/11; 12/12; 12/13; 12/14 | 12/7; 12/8; 12/9; 12/10; 12/11; 12/12; 12/13; 12/14 | 12/7; 12/8/ 12/9; 12/10; 12/11;12/12; 12/13; 12/14 |
| D16S539 | 9/14 | 9/14 | 9/14 | 9/14 | 9/14 |
| TH01 | 7/7 | 7/9 | 7/7 | 7/7 | 7/7; 7/9 |
| TPOX | 8/10 | 8/10 | 10/6; 10/7; 10/8; 10/9; 10/10; 10/11; 10/12 | 10/6; 10/7; 10/8; 10/9; 10/10; 10/11; 10/12 | 10/6; 10/7; 10/8; 10/9; 10/10;10/11; 10/12 |
| CSF1PO | 11/12 | Not used | 12/7; 12/8; 12/9; 12/10; 12/11; 12/12; 12/13; 12/14 | 12/7; 12/8; 12/9; 12/10; 12/11; 12/12; 12/13; 12/14 | 12/7; 12/8; 12/9; 12/10; 12/11;12/12; 12/13; 12/14 |

¶ 118      The Cellmark analysts examined the electropherogram and found not enough information (*i.e.*, the peak was not high enough) to make a "call" (determine the alleles) at six loci (D3, D8, D18, D13, D7, and CSF). Yet Jackson and Gordon felt comfortable making a call at D3, D8, D13, D7, and CSF. (They agreed that there was not enough information at D18.) The FBI requires results at *eight* loci for an unknown profile to be submitted to its database. See Federal Bureau of Investigation CODIS and NDIS Fact Sheet, *available at* https://www.fbi.gov/servi ces/laboratory/biometric-analysis/codis/codis-and-ndis-fact-sheet. Cellmark's analysis barely met this standard.

¶ 119      The Cellmark analysts examined locus TH01 and determined that the mixed profile donor was a 7/9. (The numbers indicate that the donor had seven "repeats," or repeated DNA sequences, on one side of the locus and nine repeats on the other side.) Jackson, in both her

- 25 -

2007 and 2012 reports, determined it was actually 7/7. Gordon stated that it could be either a 7/7 or a 7/9. Fountain is a 7/7; thus, under Cellmark's interpretation he was excluded as the donor, but significantly, Gordon and Jackson included him (though they did not agree with each other as to the possible alleles at that locus).

¶ 120      Jackson's 2012 report made a fundamental change from her 2007 report, at the D8 locus. Originally, Jackson had analyzed this locus as one possibility: 16/16. (Fountain is a 14/16.) In 2012, Jackson decided that she should have written three possible alleles at that locus: 13/16, 14/16, and 16/16. Confusingly, Jackson testified that even in 2007, her opinion was that Fountain could not be excluded (though his 14/16 did not match her original report at that locus); she appeared to attribute the change to a clerical error made in 2007 that she corrected in 2012. To top it off, Gordon did not agree with either of Jackson's reports; she interpreted the D8 locus to include only 13/16 and 14/16 as possible alleles.

¶ 121      In the end, there were *only four loci* about which all four state reports agreed as to the possible alleles. Four of thirteen loci. Astonishingly, Illinois courts have admitted such partial DNA evidence and testimony. See *People v. Mitchell*, 2011 IL App (1st) 083143, ¶ 10 (four loci compared); *People v. Smith*, 2012 IL App (1st) 102354, ¶ 20 (6 of 10 available loci, 9% of African-Americans were included as contributors). The problem is not limited to Illinois: other states also admit these partial DNA samples because of a lack of standards to determine whether DNA samples, or statistical calculations derived from them, are credible. See, *e.g.*, *People v. Coy*, 669 N.W.2d 831, 836 (Mich. Ct. App. 2003) (five loci); *State v. Bailey*, 677 N.W.2d 380 (Minn. 2004) (five loci plus sex gene). But a match does not conclusively identify a subject, even when every locus matches. See *State v. Wright*, 2011 MT 92, ¶¶ 21-25, 360 Mont. 246, 253 P.3d 838. And "[t]he dangers of partial matches have been known for over a decade." *People v. Wright*, 2012 IL App (1st) 073106, ¶ 83.

¶ 122      It is not surprising that the DNA testing did not produce conclusive results at all 13 loci. After all, this was a miniscule amount of material drawn from underneath the victim's fingernails (and a "mixed" profile, making it exceedingly difficult, since the experts had to tease out Guerrero's results from the mixture before determining the profile of the "minor" contributor).

¶ 123      Incredibly, there appears to be no common standard on which the State experts relied in drawing their conclusions. Even within the ISP, Jackson and Gordon disagreed about the possible alleles at two loci (D8 and TH01). They are not alone in this. In one study, biologists gave electropherograms from an actual criminal case to 17 expert DNA analysts and asked them to determine whether a suspect could be excluded from the results. Itiel E. Dror & Greg Hampikian, *Subjectivity and Bias in Forensic DNA Mixture Interpretation*, 51 Sci. & Just. 204, 205 (2011). Though all 17 analysts worked in the same laboratory and followed the same interpretation guidelines, their results differed. *Id.* One concluded that the suspect could not be excluded as the contributor; 12 concluded that he was excluded; and 4 determined that the data was inconclusive. *Id.* The authors determined that there was "an element of subjectivity" in interpreting DNA. *Id.*

¶ 124      From this, one could easily conclude that the strength of the DNA evidence presented to a jury might depend only on which analyst was assigned to do the analysis. Such arbitrary randomness does not comport with due process nor does it give confidence that the State is pursuing the actual perpetrator.

¶ 125    Despite these evident shortcomings, the State experts testified that the minor donor's profile (matching Fountain's at the particular loci) would occur rarely. These probability statistics rely on the product rule, which multiply loci frequencies to determine the probability of a random match using a population genetic statistics database. *Wright*, 2011 MT 92, ¶ 22. In many cases, experts applying the product rule testify that the likelihood of another match is so rare that it is likely no other living human being would share that genotype profile. See *State v. Lopez*, 45 A.3d 1, 11 (R.I. 2012) (DNA expert testified that probability of another individual matching the profiles was 1 in 11.45 quadrillion); *State v. Bander*, 208 P.3d 1242, 1244 (Wash. Ct. App. 2009) (prosecution calculated another person sharing defendant's profile was 1 in 470 billion); *People v. Hill*, 107 Cal. Rptr. 2d 110, 114 (Ct. App. 2001) (expert testified defendant's DNA had genetic profile occurring in 1 of 5.89 trillion African-Americans). The State experts testified variously that the probability could be 1 in 1.7 billion or 1 in 56 billion (another example of the disagreements within the State's case). The State repeatedly emphasized these large numbers in its closing argument: "You have to leave this planet. Perhaps with Captain Kirk and go to other solar systems. If you are lucky, find eight more planet Earths that are populated with seven billion people on each planet, to start looking for this rare a profile."

¶ 126    But these probabilities can be powerfully misleading. Scientists and legal scholars have questioned whether the high numbers testified in court estimating the probability of a nine-loci "match" are "no better than alchemy." David H. Kaye, *Trawling DNA Databases for Partial Matches: What Is the FBI Afraid Of?*, 19 Cornell J.L. & Pub. Pol'y 145, 145 (2009). The high numbers may sound impressive but may not be grounded in reality. See *id.* at 148 ("There is something to the notion that one should not take the number of zeroes in the random-match probabilities too seriously."); see also Erin Murphy, *The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence*, 95 Calif. L. Rev. 721, 781 (2007) ("recent evidence calls into question the accuracy of using the product rule to convey match probabilities"). And juries can easily mistake the meaning of such a number: "we expect one of 180 million people to have this profile" does *not* mean that the odds are 180 million to one that a defendant is not the source of the DNA. See Andrea Roth, *Safety in Numbers? Deciding When DNA Alone Is Enough to Convict*, 85 N.Y.U. L. Rev. 1130, 1148 (2010) (explaining difference between "random match probability" and "source probability"); see also *McDaniel v. Brown*, 558 U.S. 120, 128 (2010). The actual odds that a defendant is the source of the DNA depend heavily on the size of the suspect population in the area. Roth, *supra*, at 1148.

¶ 127    The rare probabilities derived from the product rule can easily be overblown and thus have the potential to deprive defendants of their right to a fair trial. I am concerned that is what happened at this trial. And the accuracy of the probability statistics depends on the accuracy of the loci determinations. As the computer scientists are wont to say GIGO (garbage in, garbage out), this principle most definitely applies here.

¶ 128    For evidence to be admitted, there must be a minimum standard of loci matches, and none has yet been promulgated in Illinois. If the DNA evidence is even slightly relevant, judges admit it, but judges currently are ill-equipped to determine its relevance. Judges also should take a more active role to ensure accepting this kind of evidence willy-nilly does not unfairly prejudice defendants. I certainly am not suggesting that DNA evidence should be excluded but wish to emphasize the trial court's duty to balance the probative value against the evidence's prejudicial effect. DNA evidence, in particular, can be uniquely prejudicial and misleading.

¶ 129    Both the State and the majority downplay the necessity of a continuance by claiming that Davere Jackson's opinion never changed between her first and second reports, but this refutation misses the point. In her 2007 report, Jackson's opinion (that Fountain was not excluded) made no sense because it did not match her data showing exclusion at the D8 locus. (Fountain is 14/16, but her first report determined that the minor profile was 16/16.) In the 2012 report, Jackson's opinion was unchanged but her report suddenly matched her conclusion. This inevitably changed defense strategy as to Jackson. The State also disclosed another ISP report (from Gordon), which differed still further from the three earlier reports.

¶ 130    Only a week before trial, Fountain's counsel had two state reports to compare and analyze. The State then disclosed two more reports, essentially doubling the DNA evidence when the trial was imminent. Each of these reports had different conclusions needing thorough understanding and presentation to a jury through cross-examination and testimony from defense expert Dr. Mueller or possibly a new expert altogether, had they only had the time. It is hard to imagine evidence in a criminal trial more byzantine than DNA evidence.

¶ 131    The State's jamming of Fountain's counsel with two new reports at the eleventh hour, the inherently complex and multifaceted nature of the reports, and the DNA evidence in this case warrant the trial court having granted a fair and substantial continuance and this court having reversed the verdict on that basis.

¶ 132                    Fountain Was Prejudiced by Trial Court's Decision

¶ 133    The majority concludes, based on trial counsel's performance, that Fountain was not prejudiced by the lack of continuance because trial counsel did an adequate job presenting Dr. Mueller and cross-examining the state experts. Prejudice, in this context, is a question of "what if?" (At oral argument, Fountain argued that he might have hired a different expert to address the differences between the State reports. This is waived; it should have been raised earlier.) I have no doubt that Fountain's counsel tried their best to confront this new evidence, but how can we say what was adequate under these extenuating circumstances?

¶ 134    We should consider the prominence that this evidence held within the trial. It was the centerpiece of the State's case and was inordinately complex scientific testimony and ripe for confusion. See Jonathan J. Koehler, *Linguistic Confusion in Court: Evidence from the Forensic Sciences*, 21 J.L. & Pol'y 515, 517 (2013) (confusion in understanding DNA evidence has been documented and is relatively common). DNA evidence possesses an aura of infallibility and can potentially impress on the jury that the case against the defendant appears more compelling and more potent than other evidence, and therefore, the potential for a wrongful conviction increases. See Kimberly Cogdell Boies, *Misuse of DNA Evidence is Not Always a "Harmless Error": DNA Evidence, Prosecutorial Misconduct, and Wrongful Conviction*, 17 Tex. Wesleyan L. Rev. 403, 405 (2011) ("Given the widespread belief in the reliability of DNA evidence, prosecutors must be held to the highest standard, when DNA evidence is involved."). And the State relied heavily on this evidence in its closing argument.

¶ 135    DNA testing can be an unreliable indicator of guilt. For example, in 1999, Raymond Easton was charged with burglary after law enforcement matched his DNA to a DNA database at only six loci. Jennifer L. Mnookin, *Fingerprint Evidence in an Age of DNA Profiling*, 67 Brook. L. Rev. 13, 49-50 (2001). DNA experts predicted a 1 in 37 million probability that a random person's DNA would match. *Id.* at 50. But Easton had an alibi, and so the authorities

tested four more loci, which showed that Easton's DNA did not match the DNA found at the crime scene. *Id.*

¶ 136   Easton's case underscores how human error can lead to inconclusive, if not false, results. See Adam Liptak, *The Nation; You Think DNA Evidence Is Foolproof? Try Again*, N.Y. Times (Mar. 16, 2003), http://www.nytimes.com/2003/03/16/weekinreview/the-nation-you-think-dna-evidence-is-foolproof-try-again.html. "The problem with DNA testing is not that it results in falsely positive results. The problem is the human factor." *Id.* This human factor came to play a central role in Fountain's case.

¶ 137   Given the complexity of the evidence, and the vital role this evidence took on in the trial, to conclude that somehow Fountain was not prejudiced by the trial court's decision is both naive and erroneous.

¶ 138                                Weakness of State's Case

¶ 139   In his direct appeal, Fountain did not argue that the evidence as a whole was insufficient to support a conviction. (Perhaps he should have.) But review of the State's other evidence is required to demonstrate the harmfulness of the trial court's error regarding the continuance.

¶ 140                              Cell-Phone-Tower Evidence

¶ 141   In addition to the DNA evidence, the State relied heavily on the cell-site tower evidence from FBI Agent Joseph Raschke. The cell-phone records allowed Raschke to create a map of which cell-phone towers "pinged" Fountain's cell phone during the hours surrounding the murder. Though Raschke was careful to specify that he could not pinpoint the phone's precise location during the murder, the State argued at length that this evidence showed Fountain's presence at Maggy's during the murder: "the only reasonable inference you can make is that phone is inside that triangle. Could not be outside." But this evidence is actually quite weak.

¶ 142   Critically, the phone records could not show whether Fountain was carrying that specific cell phone on that day—the records only tracked the phone's physical location but did not identify who was carrying or using it. Moreover, the State premised its theory on the idea that Fountain's phone would have pinged off the nearest cell-phone tower and that because the phone pinged off towers near Maggy's, Fountain himself must have been near Maggy's. But this theory has a number of shortcomings.

¶ 143   When a cell phone scans for signal, it "looks" for six different towers. As Raschke explained, the phone does not necessarily link to the nearest tower, it links to the tower with the strongest signal. Though the nearest tower is often strongest, the signal strength can be affected by obstacles such as buildings. Raschke had no way of accounting for whether the phone linked to towers near Maggy's because it could not link to towers that might have been closer to the phone's location (and Raschke's maps show dozens of other towers on the south side of Chicago).

¶ 144   Raschke's analysis could not account for nonoperational towers. If Fountain stood beneath a broken cell-phone tower further away from Maggy's, the phone would then "search" for the next-nearest tower, which might be closer to Maggy's though several blocks away from Fountain. Raschke's map showed a number of towers in the same neighborhood that did not "ping" off the cell phone, and he could not say whether those towers were functioning.

Similarly, if a tower becomes overloaded, the phone will switch to another tower regardless of the caller's distance from it.

¶ 145    Raschke could not say whether the phone was moving or still when it pinged off different towers despite the State's theory depending on the idea that Fountain was in one place—Maggy's—for a time. The FBI's written report specified that the range of each tower could be one to two miles. In other words, Fountain could have been many blocks away from the towers that are close to Maggy's when the cell phone pinged them.

¶ 146    Finally, the State's theory becomes even less convincing when examined closely. Raschke's map created a "box" of four towers connecting to the phone over a 24-minute period, with Maggy's inside that "box." But consider the size of the box: each of the towers was at least a mile and a half to two miles away from the other towers, so the box contained several square miles of the city. Fountain's phone's presence within that box tells us little about his activities that day.

¶ 147    If Fountain had given an alibi that he was outside the city on the day of the murder, perhaps the cell phone evidence would be more convincingly inculpatory. As it stands, I do not find it persuasive.

¶ 148                                    Eyewitness Identification

¶ 149    I will now turn to the other primary evidence against Fountain: Brandon Grzesiak's eyewitness identification.

¶ 150    According to Grzesiak, he and a friend went to Maggy's that day to buy cigars to turn into marijuana cigarettes; on his way in, and out of, the store, Grzesiak saw and briefly made eye contact with the man at the bus stop, who was wearing a baseball cap. These glimpses lasted only a few seconds at most, and Grzesiak had no reason to look carefully at the man or remember his face (since Grzesiak had no idea of what was about to take place). Grzesiak had never seen the man before and presumably saw a number of other strangers that day and the days that followed. It was not until four days after the murder that Grzesiak learned about the incident and was first asked to recollect a stranger he had seen on that day. Two weeks after the murder, Grzesiak viewed the first photo array. And in 2007, almost two years after the murders, Grzesiak viewed a lineup and identified Fountain.

¶ 151    Both the judicial and executive branches of Illinois have recognized the potential of eyewitness testimony to inculpate the wrong person. See *People v. Tisdel*, 338 Ill. App. 3d 465, 467-68 (2003); Report of the Governor's Commission on Capital Punishment, at 127-28 (2002). Courts throughout the country have reached similar conclusions. See *People v. Starks*, 2014 IL App (1st) 121169, ¶¶ 85-90 (Hyman, J., concurring) (listing other state and federal courts that have noted unreliability of eyewitness identifications).

¶ 152    These concerns are not an abstract invention of defense lawyers. Indeed, the scientific community has questioned, for well over a century, whether eyewitnesses can give a reliable, accurate identification. Gary L. Wells, Amina Memon & Steven D. Penrod, *Eyewitness Evidence: Improving Its Probative Value*, 7 Psychol. Sci. Pub. Int. 45, 47 (2006) (hereinafter Wells et al., *Eyewitness Evidence*). In the 1930s—before the advent of DNA testing—mistaken eyewitness identifications were recognized as the main source of wrongful convictions. *Id.* at 48.

¶ 153    Our pattern jury instructions deal with this problem by instructing jurors to consider "[t]he opportunity the witness had to view the offender at the time of the offense," "[t]he witness's degree of attention at the time of the offense," "[t]he witness's earlier description of the offender," "[t]he level of certainty shown by the witness when confronting the defendant," and "[t]he length of time between the offense and the identification confrontation." Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000). Fountain's jurors received this instruction, and Grzesiak's identification directly hits every one of those concerns.

¶ 154    Grzesiak's opportunity to view the man at the bus stop was fleeting: a few seconds in total. The amount of time the witness has to view the potential suspect affects his or her ability to make a correct identification; longer "exposure time" greatly boosts accuracy rates. Amina Memon, Lorraine Hope & Ray Bull, *Exposure Duration: Effects on Eyewitness Accuracy and Confidence*, 94 Brit. J. Psychol. 339, 348 (2003) (reviewing study where participants were given either 12 or 45 seconds of exposure to target's face).

¶ 155    Further, the baseball cap covering the man's head hampered Grzesiak's ability to view the man's face. Self-evidently, when a person covers part of his or her face, recognizing the face becomes harder, not easier. One study quantified this problem by instructing participants to view a videotaped liquor store robbery and later attempt to identify the perpetrator in a lineup; for half of the viewings, the perpetrator wore a hat covering his hair and hairline. Predictably, the presence of the hat affected the participants' ability to identify him: 45% identified him in the lineup if he had not been wearing a hat, but only 27% identified him if he was wearing a hat. Wells et al., *Eyewitness Evidence*, *supra*, at 54. This surely applies to Grzesiak, who was unable to describe the man's hair because of the baseball cap.

¶ 156    Second, Grzesiak's degree of attention that day was slight. He had no reason to pay any particular attention to the man he saw at the bus stop. He had no idea that the man at the bus stop was about to commit murder, or that anything was about to happen at Maggy's. This differs from the situation where an eyewitness sees a crime committed and makes a concerted effort to remember details of the perpetrator's appearance.

¶ 157    Third, Grzesiak's earliest description of the offender was vague. The most detail Grzesiak offered involved the man's clothes; Grzesiak did not recognize the man. And his participation in the composite sketch process did not help matters. These computerized "pick a facial feature" programs seem to do a poor job of creating a suspect's face because witnesses remember faces holistically, not as a collection of component parts. (The difference between remembering a famous face—say, Michael Jordan's—and remembering precisely what Michael Jordan's nose looks like.) Gary L. Wells & Lisa E. Hasel, *Facial Composite Production by Eyewitnesses*, 16 Current Directions in Psychol. Sci. 6, 7-9 (2007).

¶ 158    Worse, the research suggests the process of building a composite taints the process of remembering. Having a witness build a composite face can damage memory of the original face and make it more difficult for the witness to recognize the original face in a lineup. Wells et al., *Eyewitness Evidence*, *supra*, at 65. Even asking a witness to verbally describe a suspect has a distinct tendency to decrease the witness's ability to accurately identify the subject at a later lineup. See Christian A. Meissner & John C. Brigham, *A Meta-Analysis of the Verbal Overshadowing Effect in Face Identification*, 15 Applied Cognitive Psychol. 603, 604 (2001). These identification procedures could not have bolstered Grzesiak's earlier descriptions.

¶ 159    Fourth, Grzesiak's level of certainty about his identification wavered—at various times he had told attorneys that he did not get a good look at the suspect's face. But even if his

confidence had been unwavering, it would still be troubling. Even confident witnesses will be wrong in large numbers—perhaps as much as 20% to 30% of the time. Wells et al., *Eyewitness Evidence*, *supra*, at 66; see also Memon et al., *supra*, at 349 ("confidence is not a reliable indicator of accuracy under long exposure"). And, eyewitness confidence in identification can be affected by inadvertent feedback from law enforcement. Lynn Garrioch & C.A. Elizabeth Brimacombe, *Lineup Administrators' Expectations: Their Impact on Eyewitness Confidence*, 25 L. & Hum. Behav. 299, 313 (2001) ("Our lineup administrators were told expressly to not provide feedback to witnesses about their lineup decisions, yet they still influenced witness confidence."). Further, witnesses may overestimate the amount of time they saw a suspect's face, artificially inflating their confidence. Memon et al., *supra*, at 349. Grzesiak testified that he saw the man's face for just a few seconds in total, but there was no reason for him to even look at the man for that long as Grzesiak passed in and out of the store.

¶ 160   Fifth**,** the lengthy delay—four days—between the time when Grzesiak saw the man at the bus stop and the day police asked him to identify that stranger makes the identification less reliable. "Longer delays led to fewer correct identifications \*\*\* and more false identifications." Wells et al., *Eyewitness Evidence*, *supra*, at 54. The more time passes between the acquisition of the memory and attempting to retrieve it, the more trouble the witness will have with retrieval, and the less accurate will be the memory. Lauren O'Neill Shermer, Karen C. Rose & Ashley Hoffman, *Perceptions and Credibility: Understanding the Nuances of Eyewitness Testimony*, 27 J. Contemp. Crim. Just. 183, 186 (2011). If you were approached by police on a Friday and asked to describe a specific stranger you saw in passing while doing an errand on the previous Monday, could you accurately describe that person's clothing, facial features, or complexion?

¶ 161   Beyond the concerns evinced in the pattern jury instructions, there were other disturbing aspects to this evidence.

¶ 162   While police misconduct during lineups has been addressed and reduced by reforms, the precautions taken to ensure accuracy might not be enough. In one study asking participants to view lineups, each participant was told the target person might not be in the lineup and given the option of indicating the target was not present. Memon et al., *supra*, at 342. Yet, despite these cautionary instructions, 88% of the participants indicated that they had expected the target to be in the lineup. *Id.* at 347-48. Thus, the similar warnings given to Grzesiak that the suspect might not be in the viewed lineup may not have had any effect on his assumptions. Why would Grzesiak think that the police would bother having him view a lineup that did not contain the suspect?

¶ 163   Further, police conduct can taint a witness's recollection, even if the police are not trying to do so. Subtle suggestions can produce false reports. Steven J. Frenda, Rebecca M. Nichols & Elizabeth F. Loftus, *Current Issues and Advances in Misinformation Research*, 20 Current Directions in Psychol. Sci. 20, 22 (2011). For example, several studies asked participants if they had seen news footage of well-known events. Though no footage existed, anywhere between 40% and 60% of participants stated that they had seen the news footage. *Id.* at 22. Worse, other studies showed that suggestions can plant false memories of personal events even if the events were impossible (such as meeting Bugs Bunny at Mickey Mouse's Disneyland). *Id.* Here, where Grzesiak was asked over and over to describe and then identify a suspect, it would take only a few innocent, passing suggestions about Fountain's appearance to alter his memory of the stranger. Such "misinformation" is particularly effective when the passage of

time fades the witness's original, and here, fleeting and faint, memory of the event. Elizabeth F. Loftus, *Planting Misinformation in the Human Mind: a 30-Year Investigation of the Malleability of Memory*, 12 Learning & Memory 361, 361 (2005).

¶ 164    For another example, postidentification feedback from police can distort a witness's confidence in an identification. Worse, this kind of feedback after a mistaken identification has the real potential to impair a witness's memory of the actual perpetrator, making later identification of the correct suspect less likely. See Lara Smalarz & Gary L. Wells, *Contamination of Eyewitness Self-Reports and the Mistaken-Identification Problem*, 24 Current Directions in Psychol. Sci. 120, 121 (2015). The feedback can be as blatant as verbal approval of the witness's selection or as subtle as an officer "looking pleased" if the witness selects the suspect. *Id.* at 123. Even when police administering lineups are instructed not to provide confirmatory feedback, their knowledge of which lineup member is the suspect can influence the witness's confidence in the identification. *Id.* at 122. Grzesiak participated in many identification procedures, exponentially increasing opportunities for such feedback.

¶ 165    None of this should be seen as implying that either the police or Grzesiak set out to frame Fountain by cooking up a false identification. But the circumstances in this case were ripe for misidentification. Again, Grzesiak saw a stranger only in passing and saw the stranger for seconds, having no idea this person would be important until four days after the murder. And, Gresiak could only see part of the person's face (because of the baseball cap). When the police contacted Grzesiak, they showed him a surveillance video, then had him make a composite sketch, and then showed him multiple photo arrays and a lineup, the last of which occurred almost two years after the murder. His testimony was inherently unreliable.

¶ 166    The State had to use this evidence to bolster its shaky, unconvincing scientific evidence. Agent Raschke could only place Fountain's cell phone in the general vicinity of Maggy's (an area where literally thousands of people live and congregate) but could not pinpoint its location. The State's DNA experts could not even agree with each other on how to interpret the mixed and partial DNA profile.

¶ 167    In paragraph 41, the majority downplays these problems, reasoning that the jury went through the evidence presented and came to a decision. But this misses the point: when the trial court's erroneous ruling has such a decisive impact on the presentation of evidence, we cannot have confidence in the jury's verdict. I believe that the trial court's decision to deny a longer continuance had a profound effect on the outcome. Because I believe that the trial court erred in denying Fountain a reasonable continuance and that error prejudiced Fountain given the overall weakness of the State's case, I must dissent.