2020 IL App (1st) 172681-U

No. 1-17-2681

Order filed December 30, 2020

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 10190 |
| | ) | |
| TIMOTHY FOUNTAIN, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirmed the trial court's summary dismissal of defendant's *pro se* postconviction petition where it failed to raise an arguable basis for constitutional claims that: (1) appellate counsel was ineffective for failing to raise the issue of reasonable doubt on direct appeal where there was substantial evidence presented of defendant's guilt and defendant could not show that the result of his trial would have been different; and (2) trial counsel was ineffective for failing to present an expert witness on eyewitness testimony where defendant failed to show prejudice.

¶ 2    Following a jury trial, defendant Timothy Fountain was convicted of two counts of first degree murder and one count of armed robbery.  He was sentenced to a mandatory term of natural

life imprisonment for murder and a concurrent term of 30 years' imprisonment for armed robbery. Defendant's convictions and sentences were affirmed on direct appeal. *People v. Fountain*, 2016 IL App (1st) 131474. On August 8, 2017, defendant filed a *pro se* postconviction petition, which was summarily dismissed by the trial court in a written order on September 18, 2017. This appeal followed.

¶ 3    On appeal, defendant contends that: (1) he raised an arguable claim that his appellate counsel was ineffective for failing to raise reasonable doubt on direct appeal where the eyewitness testimony was "incredible" and the remaining evidence was based on "questionable" science; and (2) his *pro se* petition raised an arguable claim that his trial counsel was ineffective for failing to investigate and present an expert to testify about eyewitness identification. For the reasons that follow, we affirm.

¶ 4                                    BACKGROUND

¶ 5    The underlying factual background comes from this court's recitation on defendant's direct appeal.

¶ 6                              A.  Trial Proceedings

¶ 7    Defendant was charged with multiple counts of murder, armed robbery and burglary following the shooting deaths of Graciela Rodriguez and Nicholas Guerrero, and armed robbery of Maggy's Food Store (Maggy's) on August 4, 2005, in Chicago. *Fountain*, 2016 IL App (1st) 131474, ¶ 3. Before defendant's trial, the State moved to present evidence that defendant's cell phone was in the area of the store around the time of the crimes. *Id.* The State presented FBI Agent Joseph Raschke to testify about historical cell site analysis. *Id.* Defendant argued that the State failed to establish a proper foundation for this evidence where Raschke could not demonstrate

the methodologies used in concluding that defendant's cell phone was in the area of the store. *Id.* Defendant also requested a *Frye* hearing, arguing that historical cell site analysis was new and novel and was not generally accepted within the scientific community. *Id.* The trial court denied defendant's motion and granted the State's request to present the testimony. *Id.*

¶ 8    At trial, Brandon Grzesiak testified that on August 4, 2005,[1] he and his friend nicknamed "Millhouse," went to Maggy's around noon. *Id*. at ¶ 4. They knew the woman who worked behind the counter and called her "Maggy." As they walked to Maggy's, Grzesiak saw a man standing at the bus stop outside the store. *Id.* The man was wearing a dark green shirt, blue jean shorts, and a black White Sox hat. *Id.* Grzesiak did not know the man, and glanced quickly at him on his way to Maggy's. *Id.* Grzesiak and his friend went inside the store and purchased two Swisher Sweets to empty out and fill with marijuana to get high later that afternoon. *Id.* When leaving the store, Grzesiak again looked at the man at the bus stop and made eye contact with him for a few seconds before looking away. *Id.* Grzesiak identified defendant in court as the man he saw at the bus stop that day. *Id.*

¶ 9    Luis Campagna, a Frito-Lay delivery man, testified that on August 4, 2005, he walked into Maggy's to the last of three aisles and saw a man lying on the floor in a pool of blood. *Id*. at ¶ 5. He went back outside the store and called the police at approximately 12:15 p.m. or 12:20 p.m.. *Id.* He did not see anyone coming out of the store while he loaded his hand cart and did not notice any cars driving away. *Id.* Police officers arrived within minutes and cleared and secured the area. *Id.*

---

[1] Within the published opinion for defendant's direct appeal, the date is incorrectly noted as August 5, 2005; however, the record confirms that Grzesiak's testimony stated August 4, 2005, the date of the offenses.

¶ 10    Chicago police officer Christopher Chausse responded to a shooting at Maggy's on August 4, 2005, at 4458 South California Avenue. *Id.* at ¶ 6. When he arrived at 12:21 p.m., he met Campagna. *Id.* Officer Chausse saw victim Guerrero lying face down in a puddle of blood, and in the back room he saw the victim Rodriguez lying face down. *Id.*

¶ 11    Detectives Velma Guerrero[2] and William Gehrke arrived at Maggy's after the victims were transported to Mt. Sinai Hospital and before the forensic investigator arrived. *Id.* at ¶ 7. Police Investigator Raymond Jaster and his partner arrived at Maggy's at approximately 1:40 p.m. *Id.* Detective Guerrero directed Jaster to the back room of the store, where he found blood on the floor, a video recorder on a chair, and an expended 0.5 caliber cartridge on the floor underneath a chair. *Id.* The VCR recording system used at the store recorded the video from several cameras onto a VHS tape. *Id.* There were two lottery tickets inside the lottery register, one with the number 5051 and the other with the number 5157. *Id.* Police collected a cash tray from the register, the tray from the lottery machine, and a cigar box. *Id.*

¶ 12    Detective Guerrero testified that she removed the VCR, which still had the videotape inside, and took it to a multi-agency office to have the videotape removed. *Id.* at ¶ 8. The tape was subsequently removed, copied onto a disk, and numerous still images were taken from the video. *Id.* Detective Guerrero stated that she viewed the videotape probably hundreds of times. *Id.* The videotape was admitted into evidence, and Detective Guerrero testified as to its contents. *Id.* She recognized Millhouse approaching the counter in the video and Grzesiak standing by a cooler. *Id.* She also observed a young girl approach the counter and then later reappear in the scene. *Id.* A few seconds after the young girl and Grzesiak left the store, the suspect walked in

---

[2] In August 2005, Detective Guerrero's last name was Candelario.

wearing a dark green shirt, a black White Sox baseball cap, denim shorts, and a belt. *Id.* The video showed the suspect holding a silver phone. *Id.* The video showed the victim Rodriguez talking to the suspect, then the suspect checked the doorknob of the entrance to the rear area. *Id.* The suspect asked for two lottery tickets: 5157 and 5051, before pointing a gun at Rodriguez through the cash window and ordering her to open the register. *Id.* The suspect removed money from the cash register and looked under the counter. *Id.* The suspect then led Rodriguez out of the register area while asking her for the videotape. *Id*. The video then showed the suspect escorting Rodriguez towards the rear office before it ended. *Id.*

¶ 13 Officer Juan Chavez testified that he viewed the video tape and recognized Grzesiak, whose brother had been on Chavez's youth basketball team. *Id.* at ¶ 9. Chavez told Detective McCormack that he recognized Grzesiak and went to find him. *Id.* On August 8, 2005, Chavez saw Grzesiak near a restaurant located on the 3800 block of South Archer Avenue. *Id.* Chavez talked to him, and they subsequently drove to a gas station at 35th Street and South California Avenue near Maggy's where they met with Detective McCormack. *Id.*

¶ 14 Grzesiak subsequently went to the police station and participated in composing a computer-generated sketch of the man he saw at the bus stop. *Id*. at ¶ 11. After giving a description of the man he saw, Grzesiak viewed the video and recognized himself and Millhouse on the tape. *Id*.

¶ 15 On August 18, 2005, Detective McCormack spoke with Lieutenant John Farrell about the lottery tickets recovered from the scene. *Id*. at ¶ 10. One of those tickets was for number 5157, and McCormack ran that number in the Chicago police database as a south side address. *Id.* McCormack checked the photographs of those who had a "5157" address in Chicago against individuals who looked like the composite sketch put together by Grzesiak as well as the likeness

of the individual as seen on the store video. *Id.* After that search process, Detective McCormack came up with defendant's name. *Id.*

¶ 16 On August 19, 2005, Grzesiak identified defendant's photo from a photo array. *Id.* at ¶ 11. On April 12, 2007, Grzesiak viewed a lineup and identified defendant as the person he saw outside Maggy's and on the video pointing a gun at the victim Rodriguez. *Id.*

¶ 17 Officer Emmett McClendon testified that he met defendant on September 22, 1998, and at that time, he gave his address as 5157 South Union Avenue. *Id.* at ¶ 10. Sharon Moransky, a county employee, testified that she met defendant on March 29, 1999, and that he gave his address as 5157 South Union Avenue. *Id.*

¶ 18 Dr. Valerie Arangelovich, a forensic pathologist, performed the autopsies on victims Rodriguez and Guerrero, and stated that they both died from single gunshot wounds to the head. *Id.* at ¶ 12. Both bullets were fired from the same gun. *Id.* Dr. Arangelovich took fingernail clippings from both victims' hands and sealed them in an envelope before giving them to the police. *Id.* She testified that victim Guerrero exhibited multiple pinpoint abrasions and contusions near his left eye, consistent with being hit with a metal handgun. *Id.* Victim Guerrero also had a gunshot wound on the mid-portion of his right index finger. *Id.*

¶ 19 Amy Winters, a DNA analysis from Orchid Cellmark Laboratory (Cellmark), received the swabs of the fingernails of both victims and performed DNA testing on them. *Id.* at ¶ 13. Using the swabs from DNA clippings, she amplified the extracted DNA and produced an electropherogram graph. *Id.* The graph displayed 13 specific locations (loci) in the DNA, which are used in the national DNA database that is used to search profiles. *Id.*

¶ 20    Sarah Walker analyzed the victims' blood standards and learned that there was a mixed DNA profile obtained from Guerrero's left-hand fingernail clippings. *Id*. at ¶ 14. The minor profile was a man, and 8 of the 13 loci were identified. *Id.* At the time of her report, there was no suspect, and the partial mixed profile was not compared to any other profile. *Id.*

¶ 21    Davere Jackson, a forensic scientist in the DNA section of the Illinois State Police (ISP), compared the minor DNA profile obtained from Guerrero's left-hand fingernail clippings to a standard one from defendant. *Id.* at ¶ 15. In 2007, Jackson concluded that defendant could not be excluded from that minor DNA profile and could be included as a donor. *Id.* In 2012, after reading a report from defense expert Lawrence Mueller, Jackson reviewed her file and observed that she did not put all of the complete types of alleles at one of the locations, specifically, location "D8" in the deduced minor profile: 13/16 and 14/16. *Id.* Jackson's new report was issued on October 17, 2012. *Id.* Jackson testified that the data did not change, but she erred in failing to write down the additional alleles at that location in her initial report. *Id.* Jackson maintained that her opinion in 2007 and in 2012 was that defendant could not be excluded as a contributor to the partial profile, and she opined that 1 in 1.7 billion black men would have that profile. *Id.*

¶ 22    Pauline Gordon, a forensic scientist with the ISP, received the DNA profiles that Cellmark obtained from the fingernails of Guerrero. *Id*. at ¶ 16. Gordon reviewed Cellmark's profile and determined that there were some alleles at particular locations of the minor profile that had not been suggested by Cellmark, but should have been part of that profile. *Id.* In 2012, Gordon reviewed the minor profile recovered from Guerrero's fingernail clippings and made a new comparison to the standard from defendant. *Id.* Following Jackson's new report, on October 19, 2012, Gordon issued an amended report, determining that defendant could not be excluded from

having contributed to the minor male DNA profile recovered from Guerrero, meaning that defendant was included as a donor to that minor profile. *Id.* Gordon opined that 1 in 56 billion black men would have this profile. *Id.*

¶ 23    Gordon further explained that the discrepancy between her calculation of the frequency and Jackson's calculation from 2007 arose from the process now available that allows the application of statistics to those locations where there was partial information, allowing her to do more calculations at more locations. *Id.* at ¶ 17. She testified that neither her interpretation nor Jackson's would exclude defendant from the DNA profile. *Id.* Gordon acknowledged that Cellmark found that the minor profile at locus TH01 showed a 7/9, and that defendant was a 7/7 at that location. *Id.* Gordon stated that the 7/9 found by Cellmark was a "database profile" and that she created an "interpretation profile." *Id.* She further testified that Cellmark and ISP had "different guidelines" that accounted for different interpretations at the TH01 locus. *Id.* At D18S51, Gordon testified that there was allelic dropout, which means that the minor profile at that locus was not copied sufficiently and fell below the detection threshold. *Id.* Contrary to Jackson's 2007 report that considered 16/16 as an option at D8, Gordon did not consider 16/16 as an option at that location. *Id.* Gordon acknowledged that it was true that there were other possible contributors to the minor profile other than defendant, but they would need to have a known buccal standard from another individual to determine that. *Id.*

¶ 24    Solandia Haddock testified that she was the subpoena specialist for U.S. Cellular. *Id.* Defendant purchased a Kyocera KE 434 phone and became a U.S. Cellular customer on July 16, 2005. *Id.* at ¶ 18. The Kyocera was not a flip phone and at that time, was available in silver or

blue. *Id.* The call detail records for defendant's account on August 4, 2005, showed 19 incoming calls between 5 a.m. and 10:50 p.m. *Id.*

¶ 25 FBI Agent Joseph Raschke testified as an expert in the field of historical cell site analysis. *Id.* at ¶ 19. He stated that he worked on 150 to 200 cases where he was asked to determine the location of a cell phone. *Id.* Raschke testified that when a call is placed, the phone sends a signal to a cell tower. *Id.* When a call is received, the call tower sends a signal with the information to the cell phone. *Id.* A call detail record is generated that shows the time and the date the call occurred, which phones were involved, and which cell towers were used. *Id.* A phone can search up to six towers, and the call detail records do not show which towers the phone could connect with at any given moment. *Id.* There is a presumption that the phone will use the nearest tower. *Id.* Raschke's coworker, Nicky Skovran, did the initial analysis in the case, and he took all of her materials, including her report, redid the analysis, and concurred with her findings. *Id.*

¶ 26 Raschke used a PowerPoint presentation that he prepared to assist in his testimony. *Id.* at ¶ 20. Defendant's call records showed that on August 4, 2005, from 10:01 a.m. up to and including 11:24 a.m., defendant's cell phone used the cell tower at 130th Street and Vermont Avenue, for 10 calls. *Id.* The call records from 11:24 a.m. through 11:54 a.m. showed defendant's phone connecting to a series of different towers heading near the Dan Ryan Expressway. *Id.* At 11:54 a.m., defendant's phone received an incoming call and was connected to Tower 102 at 47th Street and Ashland Avenue. *Id.* at ¶ 21. At 11:56 a.m., his phone was connected to Tower 219 on Artesian Avenue, which was the tower just southwest of Tower 102. *Id.* At 11:57 a.m., defendant's phone was connected back to Tower 102. *Id.* Both Towers 102 and 219 were located near Maggy's. *Id.* At 12:09 p.m., defendant's phone connected again to Tower 219. *Id.* The next call

to defendant's phone came at 12:12 p.m., which connected to Tower 81, which was located north and a bit east of Tower 219 and less than a mile from Maggy's. *Id.* At 12:13 p.m., a call to defendant's phone connected his phone back to Tower 219. *Id.* Raschke testified that defendant was most likely located in a place that would use both of those towers. *Id.* At 12:16 p.m., call connected defendant's phone to Tower 219, and a 12:18 p.m. call connected defendant's phone to Tower 66, the tower just south and west of Maggy's. *Id.* Next, between 12:09 p.m. and 12:18 p.m., defendant received five phone calls and defendant's phone was located near Maggy's. *Id.*

¶ 27    The next call to defendant's phone was at 1:10 p.m., and defendant's phone connected to Tower 4 near 127th Street and I-57. *Id.* at ¶ 22. Between 1:10 p.m. and 1:24 p.m., defendant's phone received eight calls, and all were connected to Tower 4 near his girlfriend's house at 12752 South Morgan Street. *Id.* Raschke opined that the lack of calls to defendant's phone between 12:18 p.m. and 1:10 p.m. could have been because no one attempted to call his phone or that the phone was turned off during that time. *Id.*

¶ 28    The defense called Dr. Lawrence Mueller as an expert in the area of population genetics. *Id.* at ¶ 23. Mueller reviewed the reports from Cellmark, ISP, as well as the electropherograms in this case. *Id.* Mueller reviewed Jackson's report from 2007, which stated that defendant could not be excluded as a contributor, and he believed that Jackson's conclusion was inconsistent with the statistical calculation that was done because it focused on a group of genetic profiles, none of which matched defendant. *Id.* Looking at the statistical calculation in the 2007 report, specifically at D8 locus, the ISP concluded that the minor contributor had a profile of 16/16. *Id.* Defendant had a 14/16 at D8; therefore, Mueller concluded that defendant could not have been a contributor. *Id.* Mueller wrote that conclusion in his December 2011 report. *Id.*

¶ 29    Mueller also noted the discrepancy at TH01. *Id.* at ¶ 24. At that locus, Cellmark found that the minor profile was a 7/9, while defendant was a 7/7 at that location. *Id.* Mueller testified that the State's explanation for the discrepancy, that the interpretations were for different purposes, was inadequate. *Id.* Regarding the allelic dropout at D18S51, Mueller testified that defendant was a 18/19 at that locus; the only allele identified at that locus is a 15. *Id.* If the 15 is the only genetic variant, then defendant would be excluded. *Id.* If defendant was a contributor, then his contribution did not amplify sufficiently to be recorded. *Id.* Mueller did not believe it was the conservative approach to assume allelic dropout at this location. *Id.* If there was no allelic dropout, then this evidence was more consistent with an exclusion, rather than an inclusion. *Id.* Mueller acknowledge that there was a combination that included defendant, but also there was no way to determine which combination was correct. *Id.* Mueller testified that the first ISP report from 2007 produced a total of 21,504 different genetic profiles; Jackson's new report with the new data included had 64,512 possible profiles; and the final ISP report issued by Gordon produced 86,016 possible profiles. *Id.*

¶ 30    Luis Lechuga also testified on defendant's behalf. *Id.* at ¶ 25. On August 4, 2005, at approximately 2 p.m. or 3 p.m., Lechuga, who was 14 years old at the time, went to Maggy's, a place he usually visited several times a day. *Id.* After he walked in, he noticed a black man come in wearing a baseball cap, but defendant was not the man he saw that day. *Id.* About 30 seconds later, an older man, whom Lechuga knew as "Nicholas," also came in the store and said something in Spanish. *Id.* Lechuga testified that he felt something was wrong and went to the back of the store, unlocked the back door, exited on 45th Street and went back to the front of the store. *Id.* at ¶ 26. When he arrived at the front of the store, he saw a black man leave the store with cigarette

boxes and get into a car with two other black men. *Id.* That man was wearing a green shirt, blue jeans, and a White Sox hat. *Id.* Lechuga testified that a Frito-Lay guy told him not to go inside and that he had just called the police. *Id.*

¶ 31 On cross-examination, Lechuga acknowledged that the week he was testifying was the first time that he told any investigator that he was inside Maggy's when the two people were killed. *Id.* at ¶ 27. Lechuga testified that when he was interviewed on August 14, 2005, he never told them he went inside Maggy's because his mother did not want him to get involved; instead, he told police he was going to Tastee Freez and that he was across the street from Maggy's when he saw a man with a black White Sox hat coming out of the store. *Id.* Lechuga also told police that the man had a cell phone and got into a green car. *Id.* He further testified that he saw Guerrero's legs after the Frito-Lay man opened the door. *Id.*

¶ 32 In rebuttal, the State called Detective Guerrero, who testified that victim Guerrero's body was not found "anywhere near" where Lechuga said he had been; he was not found by the chip aisle, but by the cooler. *Id.* at ¶ 28. The back door to the store, which Lechuga testified that he fled from, had two bolt locks, and the door was still locked when the detectives arrived. *Id.*

¶ 33 Additionally, investigator John Duffy from the Cook County State's Attorney's Office testified that he interviewed Lechuga on October 26, 2012, and Lechuga told him that "he was not clear if he could not identify the man or if his mother had encouraged him not to identify anyone for his own safety." *Id.*

¶ 34 The jury found defendant guilty of two counts of murder and one count of armed robbery. The court subsequently sentenced defendant to natural life for the two murders, and a concurrent term of 30 years for armed robbery. *Id.* at ¶ 29. Defendant's direct appeal followed.

¶ 35                                    B.  Direct Appeal

¶ 36     On direct appeal, defendant argued that: (1) the trial court committed reversible error in refusing to grant defendant a meaningful continuance following the State's disclosure of a new DNA report days before the trial; (2) he received ineffective assistance of counsel; (3) the trial court erred in failing to conduct a *Frye* hearing on the admissibility of historical cell site analysis, (4) he was denied his right to a fair trial when a State witness made improper and prejudicial comments, and (5) the State made improper comments during rebuttal.  *Fountain*, 2016 IL App (1st) 131474, ¶ 2.

¶ 37     This court found as follows: (1) the trial court did not abuse its discretion in granting defense counsel's requested one day continuance as opposed to an unrequested longer continuance; (2) trial counsel's decision to challenge the DNA evidence in a different way instead of moving to exclude it was a matter of trial strategy unchallengeable under *Strickland*, and further that based on the entire evidence, presented at trial, there was not a reasonable probability that the result of defendant's trial would have been different if trial counsel had requested a complete bar of the DNA evidence or a DNA database search; (3) the trial court did not err in denying defendant's request for a *Frye* hearing because Agent Raschke's testimony regarding historical cell site information was not the product of new or novel scientific principle and methodology; (4) that although Agent Raschke was qualified as an expert to testify in the field of historical cell site analysis, he thoroughly explained the basis for his testimony establishing a sufficient foundation for his findings, thus the trial court did not err in admitting Raschke's testimony regarding the time and location of the cell towers used by defendant's phone; (5) Detective McCormack's single reference to "criminal history" was promptly stricken by the trial court, and his testimony

associating defendant's name to the lottery ticket did not prejudice defendant or deny him a fair trial considering the entire evidence presented at trial; and (6) the prosecutor's statements during rebuttal were in the realm of invited response based on defense counsel's closing argument. We then affirmed defendant's convictions and sentences. *Fountain*, 2016 IL App (1st) 131474, ¶ 95.

¶ 38                                         C.  Postconviction Proceedings

¶ 39    On August 8, 2017, defendant filed a *pro se* postconviction petition in which he alleged, among other claims, that trial and appellate counsel were ineffective.  Specifically, defendant contended that: (1) appellate counsel was ineffective for failing to raise reasonable doubt on direct appeal and (2) that trial counsel was ineffective for failing to present an eyewitness expert to challenge the reliability of the State's eyewitness, Grzesiak.

¶ 40    In summarily dismissing defendant's postconviction petition on September 18, 2017, in a written order, the trial court found that appellate counsel was not ineffective for failing to raise reasonable doubt because the evidence was not closely balanced.  The court further found that defendant's claim that trial counsel was ineffective for failing to call an expert on eyewitness testimony was meritless because the decision of whether to call a witness is strategy, and defendant failed to attach an affidavit from such witness which was fatal to his claim.  The court concluded that defendant's petition was frivolous and patently without merit.  This appeal followed.

¶ 41                                         ANALYSIS

¶ 42    On appeal, defendant contends that: (1) he raised an arguable claim that his appellate counsel was ineffective for failing to raise reasonable doubt on direct appeal where the eyewitness testimony was "incredible" and the remaining evidence was based on "questionable" science; and

(2) his *pro se* petition raised an arguable claim that his trial counsel was ineffective for failing to investigate and present an expert to testify about eyewitness identification.

¶ 43                                          A.  Standard of Review

¶ 44    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a method for an individual seeking to challenge a conviction by alleging that it was the result of a substantial denial of federal or state constitutional rights, or both. "The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal." *People v. English*, 2013 IL 112890, ¶ 22. Postconviction proceedings are not a continuation of, or an appeal from, the original case. *People v. Flowers*, 208 Ill. 2d 291, 303 (2003). Rather, a postconviction petition is a collateral attack upon the prior conviction and affords only limited review of constitutional claims not presented at trial. *People v. Greer*, 212 Ill. 2d 192, 203 (2004).

¶ 45    The Act provides a three-stage process for adjudicating petitions. *People v. Cotto*, 2016 IL 119006, ¶ 26. At the first stage, the trial court determines whether the petition is "frivolous or patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). If the petition is not dismissed at first-stage proceedings, it advances to the second stage. *Cotto*, 2016 IL 119006, ¶ 26.

¶ 46    In the second stage of postconviction proceedings, the defendant bears the burden of making a substantial showing of a constitutional violation.  *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).  If such a showing is made, then the petition proceeds to the third stage where the trial court conducts an evidentiary hearing on the merits of the petition. 725 ILCS 5/122-6 (West 2016).

¶ 47    Issues that were decided on direct appeal are barred by the doctrine of *res judicata*, and issues that could have been raised on direct appeal, but were not, are deemed waived. *People v.*

*Enis*, 194 Ill. 2d 361, 375 (2000). Waiver is not implicated, however, where a defendant's postconviction petition claim relies on evidence outside of the record. *Enis*, 194 Ill. 2d at 375-76. All well-pleaded facts in the petition and in any accompanying affidavits are taken as true. *Enis*, 194 Ill. 2d at 376.

¶ 48 In the case at bar, defendant's *pro se* postconviction petition was summarily dismissed at the first stage.

¶ 49 At the first stage of postconviction proceedings, there are no hearings or arguments, and no evidence is introduced. *People v. Savage*, 2020 IL App (1st) 173135, ¶ 48. There is only the petition, which the trial court must consider independently to determine whether it is frivolous or patently without merit. *Id.* To be dismissed at the first stage, a petition must have no arguable basis in law or in fact, and rely instead on a meritless legal theory or fanciful factual allegation. *Id*. at ¶ 51. We review the first stage dismissal of a postconviction petition *de novo*. *Id.* at ¶ 49.

¶ 50                    B. Ineffectiveness of Appellate Counsel

¶ 51 Defendant first contends that his appellate counsel was ineffective for failing to raise the issue of reasonable doubt on direct appeal.

¶ 52 Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). A petitioner who contends that appellate counsel rendered ineffective assistance of counsel must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced petitioner. *Id*. We therefore must determine whether defendant's ineffective assistance of appellate counsel claim would have been successful if raised on direct appeal.

¶ 53 A defendant's claim of ineffective assistance of counsel is analyzed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Henderson*, 2013 IL 114040, ¶ 11. To prevail on such a claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10.

¶ 54 To establish deficient performance, the defendant must show that his attorney's performance fell below an objective standard of reasonableness. *Id*. (citing *People v. Evans*, 209 Ill. 2d 194, 219 (2004)). Effective counsel refers to competent, not perfect representation. *Id.*

¶ 55 To establish the second prong of *Strickland*, a defendant must show that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Thomas*, 2017 IL App (4th) 150815, ¶ 11 (citing *People v. Houston*, 229 Ill. 2d 1, 4 (2008)). A "reasonable probability" has been defined as a probability which would be sufficient to undermine confidence in the outcome of the trial. *Id.* A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 56 The ultimate question of whether counsel's actions support a claim for ineffective assistance of counsel is subject to *de novo* review on appeal. *People v. Max*, 2012 IL App (3d) 110385, ¶ 64.

¶ 57 In support of his arguments on appeal, defendant claims that the trial court erred in summarily dismissing his petition because Grzesiak's identification of defendant was based on a brief glance and "contained the earmarks of unreliable witness identification;" the DNA evidence showed that defendant was, at best, a partial match across four to eight loci instead of the standard

13 loci; and the historical cell phone evidence was weak. Defendant asserts that the case should be remanded for second-stage proceedings under the Act.

¶ 58     We disagree. We initially note that defendant's petition raised several arguments that were addressed on direct appeal, including challenges to Agent Raschke's testimony concerning historical cell site analysis and the review of defendant's cell phone call records. Such challenges are barred by *res judicata* and may not be raised again in a postconviction petition. *Enis*, 194 Ill. 2d at 375.

¶ 59     When reviewing a challenge to the sufficiency of the evidence, this court considers whether, in viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This standard of review applies whether the evidence is direct or circumstantial and regardless of whether defendant receives a bench or jury trial. *Id.*

¶ 60     This court will not retry a defendant when considering a sufficiency of the evidence challenge. *Id.* The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses. *Id.* at ¶¶ 114-15. Accordingly, a jury's findings concerning credibility are entitled to great weight. *Id.* at ¶ 115. However, while a fact-finder's decision to accept testimony is entitled to deference, it is neither conclusive nor binding. *Id.* A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt. *Id.*

¶ 61     Turning to the evidence presented at defendant's trial, we find again, as was noted in his direct appeal, that such evidence against defendant was substantial. Defendant was identified by

Grzesiak as the man outside Maggy's shortly before the murders and as the man holding a gun in the store's video. Grzesiak also helped police create a sketch of the offender based on his observations and what he saw on the video. While defense witness Lechuga did not identify defendant as the man exiting the store after the murders, his testimony about the man's attire corroborated Grzesiak's testimony and what was shown on the store's video. Moreover, 15 days after the murders, Grzesiak identified defendant as the person he saw at the bus stop and the person on the video. On April 17, 2007, Grzesiak viewed a physical lineup and again identified defendant.

¶ 62    Additionally, there was evidence that defendant's previous address matched one of the lottery tickets found at the scene as well as evidence of defendant's cell phone records, which corroborated Grzesiak's testimony that defendant was in the area. The cell phone records established that after leaving his girlfriend's house, defendant traveled north, eventually arriving to the area around Maggy's near the time of the murders, before traveling back to the area near his girlfriend's house. The State also presented DNA evidence which linked defendant to the murders.

¶ 63    Viewing the entire evidence presented at trial in the light most favorable to the State, as we must, we cannot conclude that a challenge to the sufficiency of the evidence would have been successful on direct appeal. As such, defendant cannot establish that he was prejudiced by appellate counsel's failure to present the reasonable doubt losing argument on direct appeal. Accordingly, we find that appellate counsel was not ineffective on this basis, and that the trial court properly dismissed defendant's postconviction petition on this basis.

¶ 64                    C. Ineffectiveness of Trial Counsel

¶ 65    Defendant further contends that his trial counsel was ineffective for failing to challenge the State's witness testimony by presenting expert testimony related to eyewitness testimony.

¶ 66    Here, we initially note that this issue could have been raised on direct appeal, but was not, thus it is barred by waiver. *Enis*, 194 Ill. 2d at 375. However, as defendant claims in the alternate that appellate counsel was ineffective for failing to raise this issue on direct appeal, we will consider the issue on its merits.

¶ 67    As stated previously, to demonstrate ineffective assistance of counsel, a defendant must establish that his attorney's performance was so deficient that it fell below an objective standard of reasonableness and that defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant bears the burden of overcoming the strong presumption in favor of finding that counsel's advocacy was effective. *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005). In resolving the issue of counsel's performance, reviewing courts examine the totality of counsel's conduct, not isolated incidents. *Id.*

¶ 68    Generally, decisions concerning which witnesses to call and which evidence to present on a defendant's behalf are viewed as a matter of trial strategy, which are generally immune from claims of ineffective assistance. *Id.* Neither mistakes in trial strategy nor the benefit of another attorney's hindsight is sufficient to demonstrate that the trial attorney was objectively incompetent. *Id.* Counsel's failure to call an expert witness is not *per se* ineffective assistance, even where doing so may have made the defendant's case stronger, because the State could always call its own witness to offer a contrasting opinion. *Id.* As stated above, we review claims of ineffective assistance of counsel *de novo*. *Max*, 2012 IL App (3d) 110385, ¶ 64.

¶ 69    In this case, our review of the total record and of trial counsel's performance yields the result that trial counsel was a vigorous advocate of defendant's case. As we noted on direct appeal, defense counsel questioned and attacked the believability of every witness, not just Grzesiak. He

cross-examined each witness and presented an expert witness to discount the State's DNA evidence. In closing argument, defense counsel vigorously and vehemently attacked and challenged each witness' testimony including Grzesiak, as well as every piece of evidence presented in the State's case. See *Fountain*, 2016 IL App (1st) 131474, ¶¶ 84-87. We do not believe that defendant has overcome the presumption that the decision not to call an expert witness to further challenge Grzesiak's testimony was a matter of trial strategy. Nor do we believe that defendant has established how he was prejudiced by the failure to call such expert, as he has not shown what such testimony would have been and that it would have changed the result of the trial.

¶ 70    Accordingly, we find that defendant's postconviction petition failed to establish the ineffectiveness of either trial or appellate counsel for failure to call an expert witness on eyewitness testimony. Thus, the trial court did not err in summarily dismissing defendant's postconviction petition on this basis.

¶ 71    Hence, we conclude that the trial court properly dismissed defendant's *pro se* postconviction petition as frivolous and patently without merit.

¶ 72                                    CONCLUSION

¶ 73    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 74    Affirmed.